Daniel A. Crawford (Cal. Bar No. 187807)
Roza Crawford (Cal. Bar No. 222380)
CRAWFORD LAW GROUP
15303 Ventura Blvd., 9th Floor
Sherman Oaks, California 91403
Tel: (818) 935-6568
dac@crawfordlawgroup.com

Attorneys for Plaintiff
PHILIP SMITH

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILIP SMITH, an individual,<br><br>                Plaintiff,<br><br>   v.<br><br>RYAN COMPTON, an individual;<br>NOEL ANDREWS, an individual;<br>MONA VOGEL, an individual; and<br>DOES 1-10, inclusive,<br><br>                Defendants. | Case No.: 2:22-cv-08439-MWF-PLA<br><br>**DECLARATION OF DANIEL A. CRAWFORD, ESQ., IN OPPOSITION TO DEFENDANT NOEL ANDREWS' MOTION TO DISMISS (ANTI-SLAPP)**<br><br>Hearing Date: January 23, 2023<br>Time: 10:00 AM<br>Courtroom: 5A |

I, Daniel A. Crawford, hereby declare as follows:

1.     I am an attorney licensed to practice before the above-named Court.  I am one attorney of record for Plaintiff Philip Smith in the above-entitled case.

2.     The matters stated herein are within my personal knowledge, and I believe I could testify to these matters competently.

3.     Attached hereto as Exhibit 1 is a true and correct copy of the REPORTER'S TRANSCRIPT OF PROCEEDINGS from Tuesday, September 20, 2022, in the case of *Philip Smith v. Ryan Compton*, Los Angeles Superior Court Case No. 22STRO04032.  The transcribed hearing was for Plaintiff's application for a domestic

1

**DECLARATION OF DANIEL A. CRAWFORD, ESQ., IN OPPOSITION TO DEFENDANT ANDREWS' MOTION TO DISMISS (ANTI-SLAPP)**

violence restraining order ("DVRO"), and includes the testimony of Defendant Ryan Compton.  We obtained the transcript directly from the court reporter, Kim Yokoyama.

4.     Several portions of the transcript are highlighted or bracketed.  That was done by my office to highlight sections of the testimony relevant to this motion.

5.     I have been practicing law in California, primarily as a civil litigator, for over 25 years.  I am a 1996 graduate of the Georgetown University Law Center.  In addition to the above-named Court and all courts of the State of California, I am admitted to practice before all federal district courts in California, several federal district courts elsewhere in the country, the Ninth Circuit Court of Appeals, and the United States Supreme Court.

6.     My usual hourly rate and my contracted rate for work on this case is $500/hour.

7.     Based on my experience with numerous attorneys in Los Angeles County, and the declared rates of such attorneys in court filings, I believe that my hourly rate is reasonable, and even well below the market rate, for attorneys in Los Angeles with experience similar to mine who are in private practice and outside the context of insurance defense.  In my best recollection, the last time I was awarded fees by a court, it was in approximately 2018 at a rate of $450/hour.  In March 2022, I represented clients prevailing on an anti-SLAPP motion in the case of *Montilla v. Purnell*, Los Angeles Superior Court Case No. 21CHCV00717.  In that case, however, opposing counsel agreed to settle the issue of our clients' attorney's fees informally, remitting $21,000 for our work charged at a rate of $500/hour.  However, because the issue was resolved informally, there was no award from the court.

8.     In the present case, I have spent in excess of 35 hours preparing the papers opposing Defendant Andrews' motion to dismiss Plaintiff's complaint, including researching and drafting the opposing memorandum of points and authorities, the objections to evidence, Plaintiffs' declaration and this declaration.  In addition, I

2

**DECLARATION OF DANIEL A. CRAWFORD, ESQ., IN OPPOSITION TO DEFENDANT ANDREWS' MOTION TO DISMISS (ANTI-SLAPP)**

anticipate spending not less than five (5) more hours reviewing Defendant's reply brief and researching the points and authorities therein, and preparing for the hearing, and not less than two (2) hours to attend the hearing on Defendant Andrews' motion.

9.      Additionally, my co-counsel, Roza Crawford, has spent in excess of six (6) hours conducting legal research and editing the memorandum of points and authorities, all as part of the effort to oppose Defendant Andrews' motion.

10.     Mrs. Crawford has been practicing law for approximately 20 years and is a graduate of Boalt Hall School of Law at U.C. Berkeley in 2000.  Her usual hourly rate and her contracted rate for this case is also $500/hour, which is reasonable and below the market rate for attorneys of her experience practicing outside the context of insurance defense.

11.     On behalf of Plaintiff, we will also incur a filing fee of approximately $10.50 to file the opposition papers through the ECF system, and a parking fee of approximately $20.00 to attend the hearing on the motion, for costs of $30.50.

12.     Because Mrs. Crawford and I will spend in excess of 48 hours opposing Defendant Andrews' motion, at a rate of $500/hour, Plaintiff will incur attorneys' fees in excess of $24,000.  Adding costs of $30.50, Plaintiff will incur total attorneys' fees and costs of $24,030.50 opposing Defendant Andrews' motion.

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed in Los Angeles, California, on January 4, 2023.

_____
DANIEL A. CRAWFORD, Esq.

**DECLARATION OF DANIEL A. CRAWFORD, ESQ., IN OPPOSITION TO DEFENDANT ANDREWS' MOTION TO DISMISS (ANTI-SLAPP)**

Exhibit 1

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF LOS ANGELES

 3    DEPARTMENT ST22            HON. MICHAEL R. POWELL, JUDGE

 4

 5    PHILIP SMITH,                      )
                                         )
 6              PETITIONER,              )
                                         )
 7         VS.                           )   NO. 22STRO04032
                                         )
 8    RYAN COMPTON,                      )
                                         )
 9              RESPONDENT.              )
      _____)

10

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS
13
                  TUESDAY, SEPTEMBER 20, 2022
14

15
      APPEARANCES:
16
      FOR PETITIONER:      ZITSER FAMILY LAW GROUP, APC
17                         BY:  TERA LEE, ESQ.
                           1901 AVENUE OF THE STARS
18                         SUITE 1100
                           LOS ANGELES, CALIFORNIA  90067
19

20

21    FOR RESPONDENT:      IN PROPRIA PERSONA

22

23

24

25

26                         KIM J. YOKOYAMA, CSR NO. 12617
                           OFFICIAL REPORTER
27

28
```

```
 1                         I N D E X

 2   WITNESSES          DIRECT   CROSS   REDIRECT     RECROSS

 3   RYAN COMPTON          3

 4   NATHANIEL DEMONT     32

 5

 6

 7

 8

 9                         EXHIBITS

10
         (EXHIBITS 2, 10, 11, 12, 13, 14, 15, 16,
11       17, 18, 19, 21, 22, 24, 25, 28, 31, 34, 35,
         36, 38, 34, 35, 36, 38, 39, 42, 44, 45, 47,
12       AND 48 ARE MARKED AND ADMITTED INTO EVIDENCE.)

13            (SEE BELOW FOR DESCRIPTIONS.)

14                                            PAGE 45

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
 1   CASE NUMBER:        22STRO04032
 2   CASE NAME:          IN THE MATTER OF SMITH V. COMPTON
 3   LOS ANGELES, CA     SEPTEMBER 20, 2022
 4   DEPARTMENT ST22     HON. MICHAEL R. POWELL, JUDGE
 5   REPORTER:           KIM J. YOKOYAMA, CSR NO. 12617
 6   TIME:               9:24 A.M.
 7   APPEARANCES:        (AS HERETOFORE NOTED.)
 8
 9        THE COURT:  COURT'S CALLING MATTER NUMBER 13,
10   22STRO04032, SMITH VERSUS COMPTON.
11             IF I COULD HAVE THE PARTIES PLEASE LISTEN TO
12   MY JUDICIAL ASSISTANT AND TAKE THE OATH OR AFFIRMATION,
13   PLEASE.
14        THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.
15             DO YOU AND EACH OF YOU SOLEMNLY STATE THE
16   TESTIMONY YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE
17   THIS COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND
18   NOTHING BUT THE TRUTH, SO HELP YOU GOD?
19        THE PETITIONER:  YES.
20        THE RESPONDENT:  YES.
21        THE COURT:  MR. LEE, MAY I HAVE YOUR APPEARANCE,
22   PLEASE?
23        MR. LEE:  YES.  GOOD MORNING, YOUR HONOR.
24             ATTORNEY, TERA LEE, FROM THE ZITSER FAMILY
25   LAW GROUP ON BEHALF OF PETITIONER, MR. PHILIP SMITH.
26        THE COURT:  THANK YOU VERY MUCH.
27             THIS MATTER IS HERE FOR A CONTINUATION OF
28   THE CIVIL HARASSMENT RESTRAINING ORDER.
```

1            MR. LEE, WE HAD LEFT OFF, I BELIEVE, WITH

2     THE EXAMINATION OF MR. SMITH.

3            IS THERE ANYTHING THAT WE NEED TO ADDRESS

4     BEFORE WE RESUME?

5        MR. LEE:  NOTHING TO ADDRESS, YOUR HONOR.  BUT YOU

6     WERE STILL INQUIRING AS TO MR. COMPTON.

7        THE COURT:  OH, YOU'RE RIGHT.  WE WERE SPEAKING

8     WITH MR. COMPTON.

9            MR. COMPTON, LET ME PULL UP MY PAPERWORK

10    HERE AND I WANTED TO MAKE SURE ABOUT SOME THINGS BEFORE

11    I TURN THIS OVER TO MR. LEE.

12           MR. COMPTON, WHEN DID YOU FILE OR MAKE YOUR

13    STATEMENT OF PROBABLE CAUSE IN NEW JERSEY?  WHAT DATE

14    WAS THAT?

15       THE WITNESS:  IT WAS AROUND AUGUST 8TH.

16       THE COURT:  OKAY.  AND CAN YOU EXPLAIN TO ME,

17    BECAUSE I'M UNFAMILIAR WITH NEW JERSEY LAW, ABOUT THE

18    FILING OF THAT?  IS THAT SOMETHING THAT WAS -- YOU MADE

19    A COMPLAINT TO THE POLICE DEPARTMENT ABOUT THAT?  OR WAS

20    THAT SOMETHING IN WHICH YOU, THE POLICE HAD INVESTIGATED

21    AND THEY'RE CHARGING MR. SMITH?

22       THE WITNESS:  SO I WAS APPROACHED BY ROWAN

23    UNIVERSITY POLICE WHERE I WORK.  AND THEY WERE INQUIRING

24    ABOUT MR. SMITH CONTINUALLY CONTACTING MY PLACE OF WORK,

25    SAYING THAT HE HAD CONTINUALLY -- CONTINUOUSLY BEEN

26    MAKING ALLEGATIONS.  AND THEY BECAME ESCALATING TO THE

27    POINT WHERE HE WAS BECOMING ALARMING, STATING THAT I HAD

28    GUNS.  HE HAD A RESTRAINING ORDER ISSUED AGAINST ME AND

1    IMPLYING THAT I WOULD BE A THREAT ON CAMPUS.

2              SO THEY INQUIRED TO ME THAT IF -- ABOUT HIM,

3    CONCERNS THAT HE MIGHT SHOW UP TO CAMPUS AND DO

4    SOMETHING TO ME.  THEY REFERRED ME TO ROWAN -- I'M

5    SORRY, GO OUT FOR THE TOWN IN WHICH THE SCHOOL IS, TO

6    FILE A CRIMINAL HARASSMENT COMPLAINT.

7         THE COURT:  OKAY, ALL RIGHT.  AND THEN YOU FILED

8    THAT SUBSEQUENT TO THEM TELLING YOU ABOUT THIS?

9         THE WITNESS:  CORRECT.

10        THE COURT:  OKAY.  COUNSEL, YOU CAN GO AHEAD AND

11   YOU CAN MAKE YOUR INQUIRY.

12        MR. LEE:  THANK YOU, YOUR HONOR.

13        THE COURT:  YOU'RE WELCOME.

14

15                    DIRECT EXAMINATION

16   BY MR. LEE:

17        Q     MR. COMPTON, I JUST WANT TO CONFIRM SOME

18   BASIC INFORMATION.  COULD YOU PLEASE STATE YOUR ADDRESS?

19        A     815 SUNSET DRIVE, SUMMERVILLE, NEW JERSEY

20   [TECHNICAL DIFFICULTY] --

21        Q     AND HOW LONG HAVE YOU RESIDED THERE?

22        A     APPROXIMATELY 30 YEARS.

23        Q     AND COULD YOU PLEASE STATE YOUR TELEPHONE

24   NUMBER?

25        A     (609) 922-1423.

26        Q     AND APPROXIMATELY, HOW LONG HAVE YOU HAD

27   THAT TELEPHONE NUMBER?

28        A     OVER 15 OR 16 YEARS.

```
 1          Q       AND COULD YOU PLEASE STATE YOUR EMAIL
 2   ADDRESS?
 3          A       RYANCOMP@GMAIL.COM.
 4          Q       AND APPROXIMATELY HOW LONG HAVE YOU USED AND
 5   MAINTAINED THAT EMAIL ADDRESS?
 6          A       SINCE APPROXIMATELY 2008.
 7          Q       NOW, AT ANY POINT IN TIME, WERE YOU AWARE OF
 8   ANY PERSON, ENTITY, OR OTHERWISE USING YOUR TELEPHONE
 9   NUMBER AS IF THEY WERE YOU, BUT IT, IN FACT, WAS NOT
10   YOU?
11          A    NO.
12          Q       AND AT ANY POINT IN TIME, DID YOU BECOME
13   AWARE OF SOMEONE OR SOME ENTITY USING THE
14   RYANCOMP@GMAIL.COM EMAIL FOR PURPOSES OTHER THAN
15   YOURSELF?
16          A    NO.
17          Q       AND HAVE YOU HAD EXCLUSIVE USE, CONTROL, AND
18   MANAGEMENT OF BOTH YOUR TELEPHONE NUMBER AND EMAIL?
19          A       YES.
20          Q       AND SO NO ONE ELSE HAS ACCESS TO THESE ITEMS
21   AS FAR AS --
22          A       NOT THAT I'M AWARE OF.
23          Q       NOW, IN YOUR RESPONSE, YOU WRITE THAT "I
24   HAVE NEVER HACKED ANYONE IN ANY WAY."  COULD YOU PLEASE
25   DEFINE "HACK" AS YOU USE IT IN YOUR STATEMENT?
26          A       [TECHNICAL DIFFICULTY] UNAUTHORIZED ACCESS
27   TO ANYONE ELSE'S ACCOUNTS, DEVICES.
28          Q       SO, FOR INSTANCE, WHEN YOU SAY
```

```
1    "UNAUTHORIZED" USE WITHOUT THEIR CONSENT, WOULD THAT BE
2    FAIR?
3         A    YES.
4         Q    AND WOULD THAT ALSO INVOLVE CHANGING PRIMARY
5    EMAILS FOR ACCOUNTS TO DIFFERENT EMAILS?
6         A    I DON'T UNDERSTAND.
7         Q    SO WHEN YOU SAY, "I HAVE NEVER HACKED ANYONE
8    IN ANY WAY," WOULD THAT ENCOMPASS THE SITUATION WHERE
9    SOMEONE'S PRIMARY EMAIL WAS CHANGED TO A DIFFERENT EMAIL
10   THAT WAS NOT THEIRS FOR SOME ACCOUNT, FOR INSTANCE, LIKE
11   DROPBOX?
12        A    I'M STILL HAVING A HARD TIME FOLLOWING.  ARE
13   YOU TALKING ABOUT -- ARE YOU REFERRING TO ACCESSING THE
14   ACCOUNT TO CHANGE THE PRIMARY EMAIL ADDRESS?
15        Q    THAT'S CORRECT.
16        A    I MEAN UNAUTHORIZED ACCESS TO THE ACCOUNT TO
17   BEGIN WITH THE CHANGE, YES.  THEN, YES.
18        THE COURT:  I'M SORRY, I'M CONFUSED.  IS IT YES,
19   YOU HAVE DONE THIS, OR YES, I HAVE NOT DONE THIS?
20        THE WITNESS:  YES.  I CONSIDER THAT HACKING,
21   UNAUTHORIZED ACCESS TO TO AN ACCOUNT IN ORDER TO CHANGE
22   THE PRIMARY EMAIL ADDRESS.
23        THE COURT:  OKAY, THANK YOU.
24        Q    BY MR. LEE:  NOW, WOULD YOU CONSIDER HACKING
25   TO BE SETTING UP ACCOUNTS THAT HAVE VERY CLOSE
26   APPROXIMATIONS TO PREEXISTING ACCOUNTS WITH NAMES THAT
27   ARE SIMILAR, BUT FOR ONE DIGIT OR LETTER?
28        A    NO.
```

```
 1          Q       AND WOULD YOU CONSIDER HACKING TO INCLUDE
 2    SETTING UP ALTERNATIVE ACCOUNTS, THE POSTINGS
 3    ANONYMOUSLY?
 4          A       NO.
 5          Q       NOW, IN TERMS OF THE PROTONMAIL ACCOUNTS,
 6    THE SWAMPDUST@PROTONMAIL.COM ACCOUNT, WHAT PROMPTED YOU
 7    OR CAUSED YOU TO START USING A PROTONMAIL ACCOUNT AS
 8    OPPOSED TO SAY GMAIL AND YAHOO, ET CETERA?
 9          A       NO PARTICULAR REASON.
10          Q       AND JUST IN TERMS OF LOGGING INTO YOUR
11    PROTONMAIL ACCOUNT, HOW MANY PASSWORDS DO YOU HAVE TO
12    ENTER TO ACCESS THAT ACCOUNT?
13          A       ONE.
14          Q       AND HAS ANYONE, TO YOUR KNOWLEDGE, GAINED
15    ACCESS, UNAUTHORIZED ACCESS TO YOUR PROTONMAIL ADDRESS?
16          A       NOT THAT I'M AWARE OF.
17          Q       AND WOULD YOU SAY YOU HAVE EXCLUSIVE USE AND
18    CONTROL OVER THIS ACCOUNT?
19          A       YES.
20          Q       NOW, YOU SAY IN YOUR RESPONSE THAT YOU
21    STARTED USING THE SWAMPDUST ACCOUNT IN MARCH OF 2021 TO
22    SCRUB ANY OF MY INFORMATION THAT HAD TIES TO GOLDFINCH
23    GUITARS ON PUBLIC RECORDS; IS THAT ACCURATE?
24          A       YES.
25          Q       COULD YOU PLEASE DEFINE "SCRUB ANY
26    INFORMATION"?
27          A       I USED SERVICES -- THERE'S ONE CALLED
28    "DELETE ME" THAT WILL GO THROUGH AND TAKE -- YOU KNOW,
```

1  PUT INQUIRIES TO REMOVE PUBLIC INFORMATION ON MY BEHALF.
2  I USED AN EMAIL TO USE THAT SERVICE.
3          Q     NOW, DID YOU USE THIS EMAIL FOR ANY OTHER
4  PURPOSES?
5          A     YEAH, I USED IT TO -- I WOULD USE IT TO SIGN
6  UP FOR FREE TRIALS.
7          Q     DID YOU ALSO USE THE EMAIL TO COMMUNICATE
8  WITH PEOPLE OR KNOWN ASSOCIATES OF MR. SMITH?
9          A     YEAH, AND OTHER PEOPLE.
10         Q     DO YOU RECALL EMAILING MONA VOGEL IN MARCH
11 OF 2021?
12         A     YES.
13         Q     WHAT PROMPTED YOU TO DO THAT?
14         A     I WAS -- IN MARCH OF 2021, I WAS GIVEN A
15 RECORDING FROM MULTIPLE INDIVIDUALS FROM HIGH SCHOOL AND
16 GIVEN STORIES ABOUT MR. SMITH.  AND I HAD A GUILTY
17 CONSCIOUS IF I DIDN'T ADVISE HER.
18         Q     HOW DID YOU KNOW ABOUT MONA VOGEL?
19         A     I DON'T RECALL.
20         Q     SO BASED ON YOUR OWN RESPONSE, YOU HADN'T
21 HAD ANY COMMUNICATION OR CONTACT WITH MR. SMITH IN, I
22 BELIEVE, IT WAS APRIL OF 2018?
23         A     CORRECT.
24         Q     YET, IN MARCH OF 2021, YOU BECOME AWARE OF
25 WHO HE'S DATING AND YOU HAVE A GUILTY CONSCIOUS ABOUT
26 LETTING THIS PERSON KNOW?  AND YOU HAD ZERO RECOLLECTION
27 OF HOW YOU CAME TO KNOW THIS INFORMATION?
28         A     I BELIEVE THE INDIVIDUALS THAT SHARED THE

1   RECORDING WITH ME WERE THE ONES THAT NOTIFIED ME OF

2   MS. VOGEL.

3        Q     BUT YOU'RE NOT SURE?

4        A     AS FAR AS I REMEMBER.

5        Q     AND SO NOT ONLY DID THEY NOTIFY YOU THAT

6   MR. SMITH WAS SPEAKING TO THIS MS. VOGEL, BUT THEY ALSO

7   PROVIDED YOU HER CONTACT INFORMATION?

8        A     YES.

9        Q     NOW, BY CHANCE, DO YOU HAPPEN TO RECALL

10  THESE PEOPLE WHO WENT AHEAD AND GAVE YOU THIS

11  INFORMATION?  DO YOU RECALL THEIR NAMES, FIRST AND LAST?

12       A     YES.  HOWEVER, I DON'T FEEL COMFORTABLE

13  SHARING THAT.

14       THE COURT:  WELL, SIR, THIS IS A COURT OF LAW

15  HERE.  AND UNLESS YOU'VE GOT SOME KIND OF PRIVILEGE,

16  WHICH I DON'T BELIEVE YOU DO BECAUSE YOU'RE NOT AN

17  ATTORNEY OR A THERAPIST OR SOMETHING LIKE THAT, YOU'RE

18  GOING TO HAVE TO DISCLOSE IT OR THE COURT IS GOING TO

19  DEEM YOU AS NOT TESTIFYING IN THIS CASE.  BECAUSE HE'S

20  GOT A RIGHT TO CROSS-EXAMINE YOU SO I KNOW THAT YOU

21  MAY --

22       THE RESPONDENT:  I UNDERSTAND.

23       THE COURT:  I KNOW YOU MAY FEEL UNCOMFORTABLE.

24  THIS WHOLE SITUATION POTENTIALLY PUTS A LOT OF PEOPLE IN

25  UNCOMFORTABLE PLACES.  BUT I'M GOING TO ORDER YOU TO

26  ANSWER THE QUESTION.

27       THE WITNESS:  I UNDERSTAND.  MY APOLOGIES.

28       THE COURT:  THAT'S OKAY.  YOU DON'T NEED TO

```
1    APOLOGIZE.
2         THE WITNESS:  ALL RIGHT.  THE NAMES WERE MEGAN
3    HALL AND LAURA WEVIL.
4         Q    BY MR. LEE:  AND COULD YOU SPELL THE LAST
5    NAME OF WEVIL, LAURA WEVIL?
6         A    I'M TRYING TO REMEMBER.  I BELIEVE IT -- IT
7    IS W-E-V-I-L.
8         Q    AND WE'LL START WITH MS. MEGAN HALL.  WHAT
9    IS YOUR RELATIONSHIP WITH MEGAN HALL?
10        A    WE WERE ACQUAINTANCES THROUGH MR. SMITH
11   AROUND 2009, 2010.
12        Q    AND FROM 2010 TO 2021, WHAT WAS YOUR
13   RELATIONSHIP LIKE TO MS. MEGAN HALL?
14        A    WE WERE FRIENDS ON INSTAGRAM; HOWEVER, WE
15   NEVER COMMUNICATED.
16        Q    SO MORE ACQUAINTANCES THAN FRIENDS?
17        A    CORRECT.
18        Q    NOW, IN TERMS OF LAURA WIVEL, WHAT WAS YOUR
19   RELATIONSHIP WITH MS. WIVEL?
20        A    WE WERE CLASSMATES.
21        Q    AND FROM WHAT PERIOD OF TIME WERE THE TWO OF
22   YOU CLASSMATES?
23        A    2005, 2006.
24        Q    AND AFTER 2006, WHAT WAS YOUR RELATIONSHIP
25   LIKE WITH MS. WIVEL FROM 2006 TO 2021?
26        A    ACQUAINTANCES ON INSTAGRAM.
27        Q    BUT BY YOUR OWN DEFINITION NOT FRIENDS?
28        A    NO.
```

```
 1        Q       AND DO YOU RECALL THE CIRCUMSTANCES WHICH
 2   PROMPTED MEGAN HALL -- WELL STRIKE THAT.  LET ME ASK YOU
 3   THIS.
 4                DID THEY APPROACH YOU TOGETHER OR SEPARATELY
 5   WITH THE INFORMATION THAT YOU'RE CLAIMING THEY PROVIDED
 6   YOU IN TERMS OF MR. SMITH?
 7        A       SEPARATELY.
 8        Q       DO YOU RECALL APPROXIMATELY WHEN MS. HALL
 9   APPROACHED YOU WITH THIS INFORMATION?
10        A       APPROXIMATELY, MARCH OF -- I CAN'T RECALL IF
11   IT WAS '20 OR '21.
12        Q       AND TO THE BEST OF YOUR RECOLLECTION, WHAT
13   INFORMATION DID MS. HALL PROVIDE?
14        A       SHE PROVIDED THE NOEL RECORDING THAT WAS
15   REFERENCED YESTERDAY.
16        Q       AND DID SHE INDICATE WHERE -- HOW SHE
17   OBTAINED IT?
18        A       NO.
19        Q       DID SHE EXPLAIN WHY SHE WAS GIVING THIS TO
20   YOU?
21        A       SHE HAD TOLD ME THAT IT WAS BEING PASSED
22   AROUND.
23        Q       SO I'M JUST TRYING TO UNDERSTAND THE
24   TRANSACTION, SO COULD WE JUST BE A LITTLE MORE SPECIFIC?
25   SINCE YOU WERE ACQUAINTANCES ON INSTAGRAM, DID MS. HALL
26   REACH OUT TO YOU VIA MESSAGE ON INSTAGRAM REGARDING THE
27   NOEL RECORDING?
28        A       I BELIEVE WE RAN INTO EACH OTHER IN PERSON.
```

```
 1        Q       AND THAT WAS SOME TIME IN MARCH OF 2021,
 2   2021?
 3        A       I BELIEVE SO.
 4        Q       AND DO YOU HAPPEN TO RECALL WHERE YOU RAN
 5   INTO MS. HALL?
 6        A       I BELIEVE IT WAS A PANERA BREAD.
 7        Q       AND CITY?
 8        A       I THINK IT WAS IN JERSEY.  I DON'T REMEMBER.
 9        Q       SO COULD YOU JUST PLEASE WALK US THROUGH HOW
10   THIS OCCURRED?  SO YOU'RE STANDING AT PANERA BREAD IN
11   MARCH 2020 OR MARCH OF 2021, AND YOU SEE THIS PERSON WHO
12   IS BARELY AN ACQUAINTANCE AND SHE JUST STARTS DISCLOSING
13   THIS -- COULD YOU JUST EXPLAIN HOW THAT TRANSACTION CAME
14   ABOUT?
15        A       WE HAD A CONVERSATION, LIKE NORMAL
16   ACQUAINTANCES.  AND BECAUSE OF MY ASSOCIATION WITH
17   MR. SMITH, BECAME A TOPIC OF CONVERSATION, AND IT'S
18   NATURALLY WHERE THE CONVERSATION EVOLVED.
19        Q       AND THEN HOW EXACTLY DID YOU OBTAIN A
20   RECORDING?
21        A       I DON'T RECALL EXACTLY.
22        Q       WELL, OTHER THAN YOUR INSTAGRAM ACCOUNT, DID
23   YOUR ACQUAINTANCE, MS. HALL, HAVE ANY OTHER CONTACT
24   INFORMATION TO DELIVER THE RECORDING TO YOU?
25        A       I CAN'T REMEMBER.  I CAN'T REMEMBER IF IT
26   WAS ON A FLASH DRIVE OR I CAN'T RECALL.
27        Q       SO YOU HAVE ZERO RECOLLECTION OF WHETHER OR
28   NOT YOU RECEIVED A FLASH DRIVE OF THE RECORDING?  SO NOW
```

1   SHE'S JUST WALKING AROUND PANERA BREAD WITH A FLASH

2   DRIVE TO GIVE TO YOU?

3          THE COURT:  I'M GOING TO INTERPOSE MY OWN

4   OBJECTION.  HE SAID HE DOESN'T RECALL.

5          MR. LEE:  UNDERSTOOD.  MOVING ON.  I APOLOGIZE,

6   YOUR HONOR.

7          THE COURT:  DON'T APOLOGIZE.

8          Q      BY MR. LEE:  AND AS FAR AS THIS INTERACTION

9   AT PANERA BREAD, TO THE BEST OF YOUR RECOLLECTION, DID

10  YOU RECEIVE THE RECORDING AT THE TIME THAT YOU SAW

11  MS. HALL AT THIS PANERA BREAD?

12         A      I DON'T RECALL IF WE MET UP AFTER THAT.

13         Q      BUT AT SOME POINT IN TIME, YOU RECEIVED THE

14  RECORDING AND, APPROXIMATELY, WHEN DATEWISE, WOULD YOU

15  SAY YOU RECEIVED THE RECORDING?

16         A      SOON AFTER I RAN INTO HER.

17         Q      AND AS WE'RE SPEAKING ABOUT THE INCIDENT,

18  DOES IT JOG YOUR RECOLLECTION ANY FURTHER AS TO PANERA

19  NOW BETWEEN MARCH OF 2020 AND MARCH OF 2021?

20         A      NO.

21         Q      NOW, MOVING ON TO MS. WIVEL, SINCE YOU'RE

22  BOTH SEPARATELY WITH APPARENTLY THE SAME INFORMATION OR

23  I APOLOGIZE, WITH THE INFORMATION REGARDING MR. SMITH.

24  WHEN EXACTLY DID MS. WIVEL REACH OUT TO YOU?

25         A      I BELIEVE IT WAS A MONTH OR TWO AFTER MY

26  INTERACTION WITH MS. HALL.

27         Q      SO THAT WOULD BE APPROXIMATELY APRIL, MAY OF

28  2020 OR MAY OF 2021?

```
1          A      YES.
2          Q      AND HOW EXACTLY DID MS. WIVEL REACH OUT TO
3   YOU?
4          A      I BELIEVE I RAN INTO HER AT A FUNCTION.
5          Q      AND DO YOU RECALL WHAT TYPE OF FUNCTION IT
6   WAS?
7          A      I FEEL LIKE IT WAS -- IT COULD HAVE BEEN A
8   CHARITY FUNCTION.
9          Q      AND DO YOU RECALL WHETHER OR NOT THIS WAS
10  MORNING, NOON, NIGHT, AS FAR AS THE CHARITY FUNCTION?
11         A      MOST LIKELY DURING THE DAY.
12         Q      AND DO YOU RECALL AGAIN THE CITY?
13         A      I JUST RECALL MY AREA IN NEW JERSEY.
14         Q      AND COULD YOU DESCRIBE HOW THE INTERACTION
15  BETWEEN YOURSELF AND MS. WIVEL OCCURRED?
16         A      SIMILAR TO MY INTERACTION WITH MS. HALL.
17         Q      SO THEN IS IT SAFE TO SAY, YOU TWO MADE
18  SMALL TALK, AND THEN THE -- OR MS. WIVEL BROUGHT UP
19  MR. SMITH, AND THEN WHAT INFORMATION DID SHE PROVIDE YOU
20  REGARDING MR. SMITH?
21         A      RELATING TO WHAT?
22         THE COURT:  LET ME ASK YOU A QUESTION, COUNSEL.
23         MR. LEE:  YES.
24         THE COURT:  GO AHEAD AND REASK YOUR QUESTION.
25         Q      BY MR. LEE:  OH, I'M SORRY, YOUR HONOR.
26                WHAT INFORMATION DID MS. WIVEL GIVE YOU IN
27  REGARDS TO MR. SMITH?
28         A      SHE GAVE ME INFORMATION ABOUT THEIR PREVIOUS
```

```
 1    RELATIONSHIP, THAT I WASN'T AWARE OF AT THE TIME.
 2         Q       AND DID SHE GIVE YOU ANY OTHER INFORMATION?
 3         A       I DON'T RECALL.
 4         Q       AND WHEN I SAY "INFORMATION," I JUST NEED TO
 5    SPECIFICALLY REGARDING MR. SMITH [TECHNICAL DIFFICULTY]
 6    MS. WIVEL AND MR. SMITH'S APPARENT PRIOR RELATIONSHIP
 7    WHICH SHE GIVE YOU OR [TECHNICAL DIFFICULTY] ANY OTHER
 8    TYPE OF ANY INFORMATION REGARDING MR. SMITH?
 9         A       I DON'T RECALL.
10         Q       NOW, EARLIER YOUR TESTIMONY, YOU STATED
11    PEOPLE WILL GIVE YOU THE RECORDING.  ARE THESE THE ONLY
12    TWO PEOPLE THAT GAVE YOU ANY INFORMATION DURING THAT
13    RELEVANT TIME PERIOD MARCH OF 2020 AND MARCH OF 2021
14    REGARDING MR. SMITH?
15         A       THAT I COULD REMEMBER, YES.
16         Q       AND TO THE BEST OF YOUR RECOLLECTION OF
17    THESE TWO PEOPLE, ONLY MS. HALL PROVIDED THE RECORDING
18    TO YOU?
19         A       YES.
20         Q       DID EITHER OF THEM PROVIDE ANYTHING OTHER
21    THAN THE RECORDING AND INFORMATION?
22         A       NOT THAT I COULD RECALL.
23         Q       AND SO JUST TO BE CLEAR, NO PICTURES,
24    SCREENSHOTS, CONTACT INFORMATION FOR PEOPLE ASSOCIATED
25    WITH MR. SMITH, NOTHING LIKE THAT?
26         A       I CAN'T REMEMBER WHICH OR WHOM.  I DO
27    REMEMBER ONE OF THEM GIVING ME INFORMATION, THE EMAIL
28    ADDRESS OF MS. VOGEL.
```

1      Q      SO AT THIS POINT IN TIME, MARCH OF 2020 TO
2   MARCH OF 2021, YOU HAVE RECEIVED NOW A RECORDING AND
3   APPARENTLY THE CONTACT INFORMATION FOR MS. VOGEL, BUT
4   YOU DON'T KNOW WHO MS. VOGEL IS AT THIS POINT, DO YOU?
5      A      NO.
6      Q      WHAT INFORMATION, IF ANYTHING, DO YOU HAVE
7   ABOUT MS. VOGEL AT THIS POINT?
8      A      WHEN SHE COMMUNICATED WITH ME IN FEBRUARY
9   OF --
10     Q      I'M SORRY, COULD YOU REPEAT THAT?
11     A      FEBRUARY 2022.
12     Q      SO RIGHT NOW I'M TALKING ABOUT THE TIME
13  PERIOD WHERE YOU FIRST LEARNED FROM MS. HALL ABOUT THE
14  RECORDING, AND APPARENTLY AT THE SAME TIME OR
15  APPROXIMATELY TO THAT TIME PERIOD, LEARNED ABOUT
16  MS. VOGEL'S CONTACT INFORMATION.
17            AT THAT POINT IN TIME, WERE YOU JUST
18  LEARNING THIS ACCORDING TO YOUR TESTIMONY, WHAT DO YOU
19  KNOW ABOUT MS. VOGEL?
20     A      JUST THAT SHE WAS TRYING TO COME TO THE
21  COUNTRY.
22     Q      AND HOW DID YOU GET THAT INFORMATION?
23     A      THAT'S WHEN SHE GAVE ME HER CONTACT
24  INFORMATION.
25     Q      BUT YOU DON'T RECALL WHETHER OR NOT IT WAS
26  MS. HALL OR MS. WEVIL THAT GAVE YOU THE CONTACT
27  INFORMATION?
28     A      CORRECT.

```
 1          Q       NOW, IN TERMS OF YOUR RECOLLECTION,
 2   APPROXIMATELY, HOW LONG DID YOU HAVE THIS INFORMATION
 3   BEFORE YOU DECIDED TO REACH OUT TO MS. VOGEL?
 4          A       I DON'T RECALL.
 5          Q       BUT YOU ARE AWARE, OR AT LEAST YOU DO ADMIT,
 6   THAT SHE DID REACH OUT TO HER IN MARCH OF 2021,
 7   APPROXIMATELY?
 8          A       CORRECT.
 9          Q       AND WE'LL LOOK AT EXHIBIT 31, WHICH WOULD BE
10   LOCATED ON PAGE 62.  DO YOU RECALL WRITING THAT
11   MR. SMITH IS A PREDATOR WHO SHOWED A PATTERN OF
12   PSYCHOLOGICAL MANIPULATION?
13          A       YEAH.
14          Q       AND WHAT WAS THE PURPOSE OF THIS EMAIL?
15          A       A WARNING.
16          Q       AND WHAT EXACTLY MADE YOU FEEL COMPELLED TO
17   WARN MS. VOGEL?
18          A       TO A POTENTIAL -- HER DANGER.
19          Q       ACCORDING TO WHOM?
20          A       MY HISTORICAL KNOWLEDGE OF MR. SMITH.
21          Q       SO BASED ON YOUR OWN OPINION OF WHAT YOU
22   BELIEVE YOU REACHED OUT TO SOMEONE THAT YOU DIDN'T KNOW
23   AND HAD NO SORT OF REASON TO, OTHER THAN TO WARN THEM?
24          THE COURT:  COUNSEL, CAN YOU -- I DIDN'T
25   UNDERSTAND YOUR QUESTION.  I THINK THE WITNESS DID, BUT
26   I DIDN'T.
27          Q       BY MR. LEE:  BASED ON YOUR OWN OPINION OF
28   MR. SMITH AS THE ONLY REASON FOR REACHING OUT -- WAS
```

1    SOMEONE AT THIS POINT IS A STRANGER TO YOU, THAT IS IN

2    FACT THE ONLY REASON WHY YOU DID SO, IN OTHER WORDS TO

3    WARN MS. VOGEL?

4         A     CORRECT.

5         Q     DID YOU FEEL COMPELLED TO WARN ANYBODY ELSE

6    ABOUT MR. SMITH?

7         A     NO.

8         Q     ARE YOU FAMILIAR WITH A SANDRA FIGUEROA?

9         A     NO.

10        Q     AND JUST IN TERMS OF, AGAIN, THIS PARTICULAR

11   CONTENT OF EMAIL, WARNING THAT MR. SMITH IS A PREDATOR,

12   PSYCHOLOGICAL MANIPULATION AND THE LIKE.  TO THE BEST OF

13   YOUR KNOWLEDGE, THE ONLY EMAIL YOU SENT OUT WAS TO

14   MS. VOGEL?

15        A     CORRECT.

16        Q     AND THE ONLY REASON WHY YOU SENT THAT EMAIL

17   OUT TO HER WAS TO WARN HER?

18        A     CORRECT.

19        MR. LEE:  YOUR HONOR, HOW WOULD THE COURT LIKE TO

20   RECEIVE IMPEACHMENT OR REBUTTAL EVIDENCE?

21        THE COURT:  I DON'T KNOW, COUNSEL.  I DON'T KNOW

22   WHAT YOU CAN DO, BECAUSE I DON'T HAVE IT.  THAT'S WHY I

23   DON'T LIKE COURTCONNECT.  I DON'T KNOW HOW YOU'RE

24   PLANNING TO DO THIS.

25        MR. LEE:  IN PAST EXPERIENCE, THE COURT WOULD

26   PROVIDE AN EMAIL AND IT WOULD CC THE RESPONDENT AND GET

27   THE DOCUMENT OVER.  AND THEN WE PROCEED UNTIL EVERYBODY

28   HAD IT.

```
1          THE COURT:  I DON'T DO THAT IN THIS DEPARTMENT.  I
2    DON'T -- BECAUSE WE DON'T KNOW WHAT WE'RE RECEIVING.
3          MR. LEE:  UNDERSTOOD.  IN THAT CASE --
4          THE COURT:  WE CAN MAKE YOU A PRESENTER,
5    POTENTIALLY.  AND YOU CAN SHARE IT ON THE SCREEN, IF YOU
6    GOT IT.
7          MR. LEE:  THAT'S WHERE I WAS GOING NEXT, BUT,
8    PERHAPS --
9          THE COURT:  AND YOU'LL HAVE TO FORGIVE ME BECAUSE
10   I'VE NEVER USED THIS FUNCTION BEFORE, SO I DON'T KNOW
11   ANYTHING ABOUT IT.
12         MR. LEE:  OKAY.  I'M JUST MAKING SURE.
13              ALL RIGHT.  AND THIS SHOULD BE -- COURT ONCE
14   I'M MADE A PRESENTER.
15         THE COURT:  OKAY.  JOSIE, GO AHEAD AND MAKE HIM A
16   PRESENTER.
17         THE CLERK:  IT'S DONE.
18         MR. LEE:  THANK YOU.
19         THE CLERK:  AND PARTIES HAVE TO TURN ON --
20         THE COURT:  EVERYBODY HAS TO TURN ON THEIR CAMERA.
21   MR. COMPTON, DO YOU HAVE A CAMERA ON?
22         THE RESPONDENT:  I HAVE TO FIGURE IT OUT.
23         THE COURT:  BUT HE CAN SEE US; CORRECT?  CAN YOU
24   SEE US?
25         THE RESPONDENT:  YES.  I CAN SEE YOU.  I CAN'T
26   FIGURE OUT MY CAMERA.
27         THE COURT:  DOES IT HAVE A LENS ON IT?
28         THE RESPONDENT:  YEAH, IT'S AN ELECTRONIC CAMERA.
```

```
1          THE COURT:  IS THE LENS OFF?
2          THE RESPONDENT:  IT'S NOT CONNECTING.
3          THE COURT:  OKAY.  MR. LEE?
4               MR. COMPTON, DO YOU SEE THIS DOCUMENT?
5          THE RESPONDENT:  YES, I SEE THAT.
6          THE COURT:  OKAY.  MR. LEE, GO AHEAD AND ASK YOUR
7   QUESTIONS.  I DON'T SEE IT COMPLETELY, BUT I CAN SEE
8   SOME OF IT.
9          Q     BY MR. LEE:  I WILL SCROLL UP OR DOWN.
10              MR. COMPTON, CAN YOU LOOK AT THE FROM LINE
11  AND IDENTIFY WHO THIS EMAIL IS FROM?
12         A     SWAMPDUST.
13         Q     AND COULD YOU LOOK AT THE TWO LINES AND
14  WHO'S THIS EMAIL TO?
15         A     TO SANDRA FIGUEROA.
16         Q     AND COULD YOU PLEASE READ THE DATE?
17         A     JUNE 29, 2021.
18         Q     THANK YOU.
19              NOW, I'M GOING TO ENLARGE THE PICTURE A
20  LITTLE BIT MORE AND THEN SCROLL UP FURTHER.  COULD YOU
21  PLEASE TAKE A LOOK AT THE ORIGINAL MESSAGE, AND WHAT IS
22  THE DATE ON THE ORIGINAL MESSAGE?
23         A     I'M HAVING TROUBLE READING IT.
24         THE COURT:  I CAN'T SEE IT EITHER.  BECAUSE YOU'VE
25  MAGNIFIED IT AND THE DOCUMENT HAS BECOME --
26         MR. LEE:  OH, IS THAT BETTER?
27         THE COURT:  YES.
28         THE RESPONDENT:  I'M HAVING A HARD TIME READING
```

```
 1   IT.
 2        THE COURT:  ARE YOU TALKING ABOUT THE DATE IN THE
 3   RIGHT-HAND CORNER?
 4        MR. LEE:  IT'S IN THE MIDDLE, OR ORIGINAL MESSAGE
 5   AND RIGHT UNDER IT SAYS, "WEDNESDAY, MARCH 24, 2021."
 6        THE COURT:  DO YOU SEE THAT, MR. COMPTON?
 7        THE RESPONDENT:  YES.
 8        THE COURT:  OKAY.
 9        Q     BY MR. LEE:  AND THEN I KNOW IT'S DIFFICULT
10   BECAUSE IT'S A PICTURE OF A PAPER THAT HAS BEEN FOLDED.
11   BUT DO YOU SEE THE, "PLEASE BE CAUTIOUS IN DEALING WITH
12   PHILIP SMITH.  HE SHOWS A PATTERN OF PSYCHOLOGICAL
13   MANIPULATION?"
14        A     YES.
15        Q     NOW, AFTER SEEING THIS DOCUMENT, DO YOU
16   RECALL SENDING MESSAGES OUT TO ANYONE OTHER THAN
17   MS. VOGEL?
18        THE COURT:  MR. COMPTON, CAN YOU HEAR?
19        THE WITNESS:  YES.  I ANSWERED "NO."
20        THE COURT:  OH, WE DIDN'T HEAR YOU.  I'M SORRY.
21        THE WITNESS:  I APOLOGIZE.
22        THE COURT:  NO, IT'S NOT YOUR FAULT.  IT'S THE
23   TECHNOLOGY.
24             SO YOU DON'T RECOGNIZE THIS EMAIL?
25        THE WITNESS:  I DO NOT.
26        THE COURT:  DID YOU SEND THIS EMAIL?  I'M SORRY,
27   WE DIDN'T HEAR YOU, MR. COMPTON.
28             MR. COMPTON, CAN YOU HEAR ME?
```

```
1              THE WITNESS:  CAN YOU HEAR ME?

2              THE COURT:  YOU'RE CUTTING IN AND OUT, APPARENTLY.

3    MY QUESTION WAS DID YOU SEND THIS EMAIL?

4              THE WITNESS:  NO.  NO.

5              THE COURT:  OKAY, THANK YOU.

6         Q      BY MR. LEE:  NOW, THEN HAVING REVIEWED THE

7    DOCUMENTS, THOUGH, IT DOES APPEAR TO HAVE SENT FROM THE

8    SWAMPDUST@PROTONMAIL.COM.  WOULD THAT BE FAIR?

9         A      THE IMAGE MAKES IT APPEAR THAT WAY.

10        Q      AND, AGAIN, YOU PREVIOUSLY TESTIFIED THAT TO

11   THE BEST OF YOUR KNOWLEDGE, THAT EMAIL ACCOUNT HAD NOT

12   BEEN TAMPERED WITH?

13        A      CORRECT.

14        Q      AND YOU HAVE EXCLUSIVE USE AND CONTROL OF

15   MANAGEMENT OF THAT ACCOUNT?

16        A      CORRECT.

17        Q      NOW, THEN, PORTIONS LOOKING AT THE EXHIBITS

18   STARTING WITH 14, AND -- I'M SORRY, 15, WHICH IS ON

19   PAGE 30.  DO YOU SEE THE EXHIBIT THAT I'M REFERENCING,

20   MR. COMPTON?

21        A      15 IS THE DROPBOX?

22        Q      YES, THAT'S CORRECT.

23        A      YES.

24        Q      AND WHAT EMAIL ADDRESS IS NEXT TO THE PHILIP

25   SMITH IN THE MIDDLE OF THE EXHIBIT?

26        A      SWAMPDUST@PROTONMAIL.COM.

27        Q      AND BASED ON YOUR GENERAL UNDERSTANDING OF

28   HOW THE MESSAGE IS STATED, DOESN'T IT APPEAR THAT
```

```
 1   SWAMPDUST INVITED MR. SMITH TO VIEW A FILE?

 2        A     THAT'S WHAT THE IMAGE APPEARS.

 3        Q     NOW, WHEN YOU SAY THE -- THAT IS WHAT THE

 4   IMAGE APPEARS, ARE YOU IMPLYING THAT YOU BELIEVE THAT

 5   THIS IS SOMEHOW MODIFIED OR OTHERWISE TAMPERED WITH?

 6        A     TO ME, IT APPEARS THAT WAY.

 7        Q     HOW SO?

 8        A     IT'S A SCREENSHOT.

 9        Q     AND IS THAT THE ONLY BASIS FOR ATTEMPTING TO

10   CHALLENGE ITS AUTHENTICITY?

11        A     TO ME, IT FEELS -- IT FEELS LIKE A MODIFIED

12   SCREENSHOT.

13        Q     NOW, YOU TESTIFIED EARLIER THAT YOU REALLY

14   HAD NO TECHNICAL EXPERIENCE OR OTHERWISE AND DIDN'T

15   REALLY KNOW, YOU KNOW, TOO MUCH ABOUT DROPBOX EVEN.  SO

16   OTHER THAN A FEELING, IS THERE SOME SORT OF TECHNICAL

17   BASIS OR FAMILIARITY WITH DROPBOX IN PARTICULAR THAT

18   WOULD MAKE YOU FEEL AS IF THIS WERE SOMEHOW A MODIFIED

19   SCREENSHOT?

20        A     CAN YOU REPEAT THE QUESTION?

21        Q     YOU TESTIFIED EARLIER THAT YOU DIDN'T REALLY

22   POSSESS VERY SAVVY TECHNICAL KNOWLEDGE.  YOU DENIED

23   HAVING THE ABILITY THAT MR. SMITH TESTIFIED ABOUT

24   PREVIOUSLY, SUCH AS BEING ABLE TO MOVE HIS MOUSE AROUND

25   WHILE HE WAS ON HIS COMPUTER FROM YOUR COMPUTER.  AND

26   YOU TESTIFIED PREVIOUSLY THAT YOU WERE NOT FAMILIAR WITH

27   DROPBOX.

28             SO WHAT I'M ASKING SPECIFICALLY IS WHAT IF
```

1    ANYTHING IS THE BASIS OF YOUR FEELING THAT THIS MAY BE

2    AN ALTERED SCREENSHOT IF YOU'RE NOT FAMILIAR WITH

3    DROPBOX AND YOU DON'T HAVE A WHOLE LOT OF TECHNICAL

4    [TECHNICAL DIFFICULTY]?

5         A     IT FEELS MODIFIED.

6         Q     AND WOULD THAT BE YOUR POSITION REGARDING

7    THE FOLLOWING EXHIBITS, WHICH ARE ESSENTIALLY THE SAME

8    TYPE OF DROPBOX MESSAGE INDICATING THAT SWAMPDUST,

9    SWAMPDUST SENT AN EMAIL TO MR. SMITH, YOUR POSITION

10   WOULD JUST BE THAT THEY FEEL LIKE ALTERED SCREENSHOTS?

11        A     CORRECT.

12        Q     BUT YOU CAN ADMIT THAT AT LEAST AS FAR THE

13   IMAGE ITSELF IS REFERENCING THE SWAMPDUST@PROTONMAIL.COM

14   ACCOUNT?

15        A     CORRECT.

16        Q     AND ACCORDING TO YOU, YOU DID NOT SEND ANY

17   OF THESE; IS THAT CORRECT?

18        A     I DID NOT.  I DID NOT.

19        Q     YES, I HEARD.

20              NOW, IN TERMS OF JUST OVERALL USE OF DROPBOX

21   IN GENERAL, HAVE YOU USED DROPBOX PREVIOUSLY?

22        A     I RECALL USING IT AROUND 2010 OR WHENEVER IT

23   WAS NEW.

24        Q     BUT NOT REALLY WORKING WITH THAT PARTICULAR

25   APPLICATION MUCH MOVING FORWARD?

26        A     NO.

27        Q     NOW, HAVE YOU EVER MADE A SOCIAL MEDIA

28   ACCOUNT THAT IS CLOSE IN NAME TO A PREEXISTING BUSINESS,

1    SUCH AS DEMONT GUITARS?

2         A     NO.

3         Q     AND HAVE YOU EVER MADE A SOCIAL MEDIA

4    ACCOUNT THAT IS CLOSE IN NAME TO A PREEXISTING BUSINESS,

5    SUCH AS GOLDFINCH GUITARS?

6         A     NO.

7         Q     AND HAVE YOU EVER USED AN ALTERNATIVE

8    ACCOUNT TO POST ANYTHING ANONYMOUSLY, THE PREVIOUS

9    [TECHNICAL DIFFICULTY] BUSINESS SUCH AS DEMONT GUITARS

10   OR GOLDFINCH, SPECIFICALLY?

11        A     NO.

12        Q     NOW, JUST IN TIME, WOULD YOU SAY THAT AT

13   LEAST THE EMAIL REGARDING MS. VOGEL, WHICH YOU ADMIT TO

14   SENDING OCCURRED BEFORE SEPTEMBER 29, 2021?

15        A     CAN YOU REPEAT THE QUESTION?

16        Q     THE EMAIL THAT YOU SENT TO MS. VOGEL WARNED

17   HER, WHICH OCCURRED IN MARCH OF 2021.  CAN WE AGREE OR

18   DO YOU AGREE, RATHER, THAT THAT WOULD HAVE OCCURRED

19   BEFORE SEPTEMBER 29, 2021?

20        THE COURT:  COUNSEL, I'LL AGREE WITH THAT, THAT

21   MARCH HAPPENS BEFORE SEPTEMBER.  WHY DON'T WE ASK A

22   QUESTION THAT'S GOING TO LEAD ME SOMEWHERE.

23        Q     BY MR. LEE:  NOW, IN TERMS OF YOUR EXHIBIT 4

24   IN YOUR RESPONSE, YOU EXPLAIN THAT THIS DATING THAT THE

25   CHARGE BACK WAS THE PETITIONER USING YOUR SOCIAL

26   SECURITY NUMBER FOR HIS NEW BUSINESS.  COULD YOU JUST

27   DIRECT MY ATTENTION TO WHERE IN EXHIBIT 4 IT SAYS THAT

28   OR SEEMS TO INDICATE THAT?

```
 1        A      THAT WAS ACTUALLY TOLD TO ME BY PAYPAL OVER
 2   THE PHONE.
 3        THE COURT:  COUNSEL, WE HAD TALKED ABOUT THIS
 4   YESTERDAY.  BECAUSE I HAD ASKED THAT SAME QUESTION, THAT
 5   IT DIDN'T APPEAR ON THERE.  HE TESTIFIED THAT IT WAS
 6   SPOKEN TO HIM.
 7        MR. LEE:  YES.  AND I WAS JUST USING THAT FOR THE
 8   SET UP FOR THE NEXT QUESTION, YOUR HONOR.
 9        THE COURT:  OKAY.
10        Q      BY MR. LEE:  IN TERMS OF THAT STATEMENT, DO
11   YOU KNOW IF THEY STATED IT WAS YOUR SOCIAL SECURITY
12   NUMBER INDIVIDUALLY OR PERHAPS A BUSINESS EIN?
13        A      IT WAS MY SOCIAL SECURITY NUMBER.
14        Q      NOW, IN TERMS OF THIS EXHIBIT 4, THE ONLINE
15   ACCOUNT CREATION DATE IS NOVEMBER 14, 2017, DO YOU SEE
16   THAT?
17        A      YES.
18        Q      AND WHO CREATED THAT ACCOUNT?
19        A      I CREATED IT.
20        Q      AND AT THE TIME OF THE CREATION, DID YOU USE
21   YOUR SOCIAL SECURITY NUMBER?
22        A      YES.
23        Q      AND THEN AFTER THE BUSINESS WAS ALL -- WHAT
24   DID YOU DO TO END OR OTHERWISE TERMINATE THE, THIS
25   PARTICULAR PAYPAL ACCOUNT?
26        A      SO TO MAKE IT EASIER FOR MR. SMITH TO START
27   A NEW BUSINESS, I OFFERED TO TRANSFER THE EXISTING
28   ACCOUNT OVER TO HIM WITH THE STIPULATION THAT HE REMOVES
```

```
 1   MY PERSONAL INFORMATION.  AND AT THE TIME, AS FAR AS I
 2   WAS AWARE, HE DID THAT.
 3        Q     OKAY.  AND THEN FROM 2018 TO 2019, THERE
 4   WERE NO ISSUES AS FAR AS YOU RECEIVING NOTIFICATION
 5   FROM --
 6        A     CORRECT.
 7        Q     NOW, WOULD YOU HAPPEN TO HAVE ANY KNOWLEDGE
 8   WHATSOEVER WHY YOUR TELEPHONE NUMBER WOULD AUTOMATICALLY
 9   BE LINKED TO THE DEMONT GUITARS ON INSTAGRAM?
10        A     NO.
11        THE COURT:  COUNSEL, I'M GOING TO BREAK HERE FOR
12   OUR MORNING RECESS.  WE'LL BE BACK IN 15 MINUTES, OKAY?
13             AND, COUNSEL, HOW MUCH TIME DO YOU HAVE LEFT
14   BECAUSE I'M LETTING YOU GO OVER A LITTLE BIT?
15        MR. LEE:  THAT WOULD BE IT, YOUR HONOR.
16        THE COURT:  OKAY, THANK YOU.  WE'LL BE BACK IN
17   15 MINUTES.
18        MR. LEE:  THANK YOU, YOUR HONOR.
19        THE RESPONDENT:  THANK YOU.
20
21             (RECESS.)
22
23        THE COURT:  THE COURT'S BACK ON THE RECORD IN
24   MATTER NUMBER 13, 22STRO04032, 32 SMITH VERSUS COMPTON.
25             BOTH PARTIES PRESENT, THEY REMAIN UNDER
26   OATH.
27             COUNSEL FOR THE PETITIONER IS PRESENT.
28             MR. LEE, DID HAVE YOU ANY MORE QUESTIONS?
```

```
 1          MR. LEE:  NO, I HAD NO FURTHER QUESTIONS FOR
 2   MR. COMPTON.
 3          THE COURT:  OKAY, THANK YOU.
 4              MR. COMPTON, I WANTED TO ASK ABOUT A COUPLE
 5   OF THINGS.  NUMBER ONE, YOU SAID THAT YOU FELT GUILTY
 6   AND THIS IS WHY YOU WERE SHARING THIS MATERIAL.
 7              WHAT DID YOU MEAN BY THAT?  WHAT WAS IT --
 8   BECAUSE THE COURT IS UNCLEAR ABOUT WHAT MATERIAL YOU'RE
 9   SHARING.
10              MR. COMPTON, YOU'RE MUTED SO I CAN'T HEAR
11   YOU.  MR. COMPTON, IF YOU CAN HEAR ME, YOUR MICROPHONE
12   IS MUTED.  MR. COMPTON, CAN YOU HEAR ME?
13              OKAY.  MR. LEE AND MR. SMITH, WE'LL HAVE TO
14   HOLD ON FOR A SECOND UP UNTIL THE TIME WE CAN
15   REESTABLISH CONTACT WITH MR. COMPTON, OKAY?
16          MR. LEE:  UNDERSTOOD, YOUR HONOR.  THANK YOU.
17
18              (BRIEF INTERRUPTION.)
19
20          THE COURT:  MR. COMPTON?  MR. LEE, ARE YOU THERE?
21          MR. LEE:  YES, YOUR HONOR.
22          THE COURT:  THANK YOU.  MR. SMITH, ARE YOU THERE?
23          THE PETITIONER:  YES, YOUR HONOR.
24          THE COURT:  THANK YOU VERY MUCH.
25              SO WE HAD GOT ALL THE PARTIES BACK AND
26   COUNSEL HAS INDICATED HE DOESN'T HAVE ANY MORE
27   QUESTIONS.
28              MR. COMPTON, I NEED TO ASK YOU SOME
```

1    QUESTIONS.  YOU SAID YOU FELT GUILTY AND THAT YOU SHARED

2    THIS MATERIAL.  I'M UNCLEAR ABOUT WHAT MATERIAL YOU'RE

3    SHARING.  CAN YOU EXPLAIN TO ME WHAT IT WAS THAT YOU

4    SHARED?

5         THE WITNESS:  I SHARED THE -- THE SAMPLE CLIP OF

6    THE RECORDING THAT WE TALKED ABOUT WITH NOEL.

7         THE COURT:  OKAY.  AND ON THE SAMPLE CLIPS, WHAT

8    WAS BEING SAID?

9         THE WITNESS:  IT SOUNDED TO BE A VIOLENT ATTACK.

10        THE COURT:  OKAY.  AND YOU FELT GUILTY HOW?

11        THE WITNESS:  I FELT THAT MS. VOGEL WOULD BE IN

12   DANGER, LIKE, SHE WAS BEING MANIPULATED.

13        THE COURT:  OKAY.  NOW, I WANT TO ASK YOU SOME

14   ADDITIONAL QUESTIONS ABOUT SOME EXHIBITS THAT YOU

15   ATTACHED TO YOUR RESPONSE.  SPECIFICALLY, I WANT TO ASK

16   YOU ABOUT THE EMAILS THAT YOU CONTEND WERE SENT BY MR.

17   SMITH, THE GMAIL EMAILS.

18             STARTING WITH EXHIBIT 6, IS THIS AN EMAIL

19   THAT YOU RECEIVED FROM HIM?

20        THE WITNESS:  YES.

21        THE COURT:  OR FROM -- I SHOULDN'T SAY FROM HIM,

22   BUT FROM PHILIPTHEARTIST?

23        THE WITNESS:  YES.

24        THE COURT:  OKAY.  AND DID YOU KNOW

25   PHILIPTHEARTIST TO BE THE PETITIONER?

26        THE WITNESS:  YES.

27        THE COURT:  OKAY.  AND THAT -- IS THAT THE SAME

28   FOR THE NEXT EXHIBIT, EXHIBIT 7 AND EXHIBIT 8?

```
1              THE WITNESS:  YES.
2              THE COURT:  OKAY.  AND THEN YOU RECEIVED ANOTHER
3    EMAIL FROM THE SAME EMAIL ADDRESS ON JANUARY 20, 2022?
4              THE WITNESS:  CORRECT.
5              THE COURT:  OKAY.  AND THEN ON 2/20/22, DID YOU
6    RECEIVE THAT EMAIL?
7              THE WITNESS:  YES.
8              THE COURT:  AND THEN THE 2/22, THE SECOND EMAIL
9    THAT YOU ATTACHED AS EXHIBIT 11, YOU ALSO RECEIVED THAT?
10             THE WITNESS:  YES.
11             THE COURT:  OKAY.  YOU INDICATED THAT THERE WERE
12   -- THERE WAS SOME CONTACT WITH THE SCHOOL THAT YOU
13   WORKED WITH THAT RESULTED IN THEM ASKING YOU TO FILE
14   SOMETHING WITH THE POLICE; IS THAT ACCURATE?
15             THE WITNESS:  YES.
16             THE COURT:  WAS HE -- WAS -- DID YOU EVER RECEIVE
17   ANY OF THESE CALLS THAT THE UNIVERSITY WAS REFERRING
18   ABOUT OR WERE THESE CALLS THAT THEY SAID WERE BEING
19   RECEIVED BY MR. SMITH?
20             THE WITNESS:  THEY TOLD ME THAT THE OFFICE OF
21   HUMAN RESOURCES WAS CONTINUALLY BEING CONTACTED.
22             THE COURT:  OKAY.  OKAY.  THANK YOU.
23                  COUNSEL, MR. LEE, DO YOU HAVE ANY QUESTIONS
24   BASED ON MY QUESTIONS?
25             MR. LEE:  NO FURTHER QUESTIONS, YOUR HONOR.
26             THE COURT:  THANK YOU.
27                  AND, MR. SMITH, I WANT TO ASK YOU SOME MORE
28   QUESTIONS AGAIN.  DID YOU SEND THESE EMAILS TO THE
```

```
1    RESPONDENT, WHICH ARE INCORPORATED IN HIS EXHIBIT 6
2    THROUGH EXHIBIT 11?
3         THE WITNESS:  I'VE NEVER RECEIVED IMAGES OF THOSE
4    EXHIBITS.  BUT I DID REACH OUT TO HIM [TECHNICAL
5    DIFFICULTY] SWAMPDUST AT VARIOUS TIMES WARNING
6    [TECHNICAL DIFFICULTY].  AND I DID SAY SOMETHING ALONG
7    THE LINES OF SWAMPDUST HAVING A SMALL PENIS.
8         THE COURT:  OKAY.  DID YOU WRITE SOMETHING TO THE
9    EFFECT OF "COMPTON HAS A LITTLE BABY PENIS THAT DOESN'T
10   MAKE ANYONE CUM."
11             DID YOU WRITE THAT?
12        THE WITNESS:  YES, YEAH.
13        THE COURT:  OKAY.
14             OKAY.  COUNSEL, DO YOU HAVE ANY QUESTIONS
15   FOR YOUR CLIENT BASED ON THAT?
16        MR. LEE:  NO, NO FURTHER QUESTIONS.
17        THE COURT:  OKAY.  THANK YOU.
18             SO, COUNSEL, YOU HAD SOME OTHER WITNESSES
19   AND I WANTED TO FIND OUT, ARE THEY THE WITNESSES THAT
20   HAD PROVIDED THE DECLARATIONS?
21        MR. LEE:  THAT'S CORRECT, YOUR HONOR.  AND IT
22   WOULD BE OUR INTENTION BASED ON THE TIME LIMITS AND ONLY
23   AT THE COURT'S DISCRETION TO ONLY CALL MR. NATE DEMONT
24   AS AN OFFER OF PROOF.  HIS DECLARATION LAYS OUT THAT
25   MR. COMPTON HAD DONE TO DEMONT GUITARS WHAT MR. SMITH IS
26   CURRENTLY ALLEGING IN TERMS OF HACKING AND THE LIKE.
27             BUT MORE SPECIFICALLY TO WHY WE WOULD USE
28   HIS TESTIMONY, AS OPPOSED TO WHAT'S IN HIS DECLARATION,
```

1   IS HOW HE CAME TO KNOW THAT IT WAS MR. COMPTON BECAUSE

2   HE TOOK STEPS TO TRACE TECHNICAL ASPECTS OF IT.  AGAIN,

3   IT'S NOT AS AN OFFER OF PROOF.  HE WOULD TESTIFY THROUGH

4   -- WITH MORE SPECIFICITY THAN --

5        THE COURT:  NO.

6        MR. LEE:  -- IN THIS DECLARATION.

7        THE COURT:  I'LL ALLOW HIM TO TESTIFY.  JUST SO

8   THAT THE PARTIES KNOW THAT I'M GOING TO INCORPORATE THE

9   DECLARATIONS THAT HAVE BEEN PROVIDED TO THE COURT INTO

10  EVIDENCE AS TO BOTH SIDES.  THE ISSUE OF THE, MR. DEMONT

11  TESTIFYING, IS HE ONLINE OR IN A ROOM, JOSIE?

12       THE CLERK:  HE'S IN A ROOM.

13       THE COURT:  CAN WE BRING HIM IN?

14       THE CLERK:  YES.  HI, MR. DEMONT, CAN YOU HEAR ME?

15       THE WITNESS:  YES.

16       THE COURT:  PLEASE LISTEN TO MY JUDICIAL

17  ASSISTANT.

18       THE WITNESS:  OKAY.

19       THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

20            DO YOU SOLEMNLY STATE THE TESTIMONY YOU MAY

21  GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL BE

22  THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

23  SO HELP YOU GOD?

24       THE WITNESS:  YES, SIR, I DO.

25       THE CLERK:  PLEASE STATE YOUR FIRST AND LAST NAME

26  AND SPELL THEM FOR THE RECORD.

27       THE WITNESS:  MY FIRST NAME IS NATHANIEL,

28  NATHANIEL, MY LAST NAME IS DEMONT, D-E-M-O-N-T.

```
 1          THE CLERK:  THANK YOU.
 2          THE COURT:  THANK YOU, MR. DEMONT.  MY NAME IS
 3   JUDGE MICHAEL POWELL.  THANK YOU FOR JOINING US TODAY.
 4   I'M GOING TO TELL YOU A COUPLE OF RULES.  PLEASE FOLLOW
 5   THEM.
 6               NUMBER ONE, THERE IS A COURT REPORTER THAT
 7   TYPES DOWN THESE PROCEEDINGS.  IF I'M SPEAKING, PLEASE
 8   DON'T SPEAK OVER ME OR THE ATTORNEY BECAUSE THAT FORCES
 9   HER TO WRITE DOWN WHAT TWO PEOPLE ARE SAYING
10   SIMULTANEOUSLY, WHICH IS ALMOST AN IMPOSSIBILITY.
11               NUMBER TWO, PLEASE TRY TO CONFINE YOUR
12   ANSWERS TO ANSWERING THE QUESTION ONLY.  SO IF IT'S A
13   YES-OR-NO QUESTION, JUST ANSWER YES OR NO.  DON'T GO ON
14   A BIG LONG EXPLANATION ABOUT SOMETHING UNLESS IT'S
15   REQUESTED OF YOU, OKAY?
16               OKAY.  SIR, ARE YOU IN A ROOM BY YOURSELF?
17          THE WITNESS:  YES, I AM.
18          THE COURT:  OKAY, THANK YOU.
19               COUNSEL, YOU MAY INQUIRE.
20          MR. LEE:  THANK YOU, YOUR HONOR.
21
22                    DIRECT EXAMINATION
23   BY MR. LEE:
24        Q     MR. DEMONT, COULD YOU PLEASE STATE YOUR
25   OCCUPATION?
26        A     I AM A GUITAR [TECHNICAL DIFFICULTY] AND
27   WHERE WE DO SMALL MANUFACTURING IN RETAIL POWER AND
28   MUSICAL INSTRUMENT.
```

```
1          Q       AND DO YOU KNOW MR. PHILIP SMITH?

2          A       YES, I DO.

3          Q       AND DO YOU KNOW MR. RYAN COMPTON?

4          A       YEAH.

5          Q       AND HOW DID YOU MEET THE TWO?

6          A       WELL, MR. SMITH, I MET ONLINE MANY YEARS AGO

7   IN A GUITAR FORUM DISCUSSING THE ORIGINS OF AN UNKNOWN

8   GUITAR AND WE JUST BECAME FRIENDS FROM THERE, AND WE'VE

9   KNOWN EACH OTHER FOR A LONG TIME SINCE.  MR. COMPTON, I

10  MET THROUGH MR. SMITH.  I DO NOT RECALL THE FIRST TIME

11  THAT I TALKED TO MR. COMPTON.

12         Q       NOW, IN EVENTS OF THE HEARING, YOU PROVIDED

13  A LETTER THAT WAS SIGNED UNDER PENALTY OF PERJURY

14  REGARDING CERTAIN TRANSACTIONS WITH MR. SMITH AND

15  MR. COMPTON.  DO YOU RECALL THAT?

16         A       YES.

17         Q       AND JUST BRIEFLY, COULD YOU PLEASE DESCRIBE

18  FOR THE COURT WHAT OCCURRED TO YOUR BUSINESS AROUND

19  FEBRUARY OF 2017?

20         A       YES.  I'LL TRY TO MAKE IT BRIEF, ALTHOUGH

21  THERE'S A LOT OF PARTS TO IT.  IN 2017 -- WELL,

22  ACTUALLY, IN 2016 IS WHERE IT WOULD START.  MR. SMITH

23  AND MR. COMPTON MADE SOME SORT OF BUSINESS AGREEMENT

24  AMONGST THEMSELVES TO SELL GUITARS.  THEY WORKED WITH ME

25  TO PRODUCE THE FIRST OF THOSE INSTRUMENTS.  AFTER THAT,

26  THERE WERE SOME ISSUE WITH MR. COMPTON THAT I'M NOT

27  COMPLETELY AWARE OF, SOME FALLING OUT WITH HIM AND

28  MR. SMITH.  I'M NOT SURE.
```

```
 1              BUT HE -- FEBRUARY 21ST, 2017, HE HACKED --
 2    WELL, HE ATTEMPTED TO HACK INTO MY PERSONAL FACEBOOK AND
 3    OUR INSTAGRAM ACCOUNT FROM A EPN IP ADDRESS LOCATED IN
 4    CHICAGO.  IT WAS A FAKE INTERNET IP ADDRESS TO TRY TO
 5    TRICK THE SERVER THINKING IT WAS SLOW.
 6              AROUND THE SAME TIME, HE ALSO HOOKED UP A
 7    DOMAIN DEMONTGUITAR.COM, WHICH IS VERY SIMILAR TO OUR
 8    DOMAIN, DEMONTGUITARS.COM.  AND IN CONJUNCTION, MADE AN
 9    INSTAGRAM PAGE CALLED DEMONTGUITAR.COM USING A WEBSITE
10    DEMONTGUITAR.COM.  AND THEN WENT ON TO [TECHNICAL
11    DIFFICULTY] TRY TO RECRUIT AS MANY OF OUR FANS AND
12    CUSTOMERS AS POSSIBLE.
13              THAT WEBSITE THEN PURCHASED DEMONTGUITAR.COM
14    THAT IS LISTED ON INSTAGRAM, FORWARDED IT TO A
15    PORNOGRAPHIC WEBSITE.  AT THE TIME WHEN I FIRST
16    DISCOVERED THIS, I WASN'T QUITE SURE WHAT WAS GOING ON.
17    INITIALLY, I THOUGHT MAYBE MR. SMITH HAD SOMETHING TO DO
18    WITH IT.  AND I CALLED HIM AND HE HAD NOT A CLUE OF WHAT
19    WAS GOING ON.  WE TALKED TO RYAN COMPTON AND IT WAS
20    MR. COMPTON.
21              MR. SMITH TALKED TO HIM AND GOT HIM TO STOP
22    -- STOP DOING THAT.  I'M STILL NOT CLEAR.  I THINK HE
23    WAS ANGRY BECAUSE WE WERE A COUPLE OF MONTHS BEHIND ON
24    ONE OF HIS PROJECTS.  I NEVER HAD A CLEAR ANSWER ON
25    THAT.  THE INSTAGRAM ACCOUNT DEMONTGUITAR WAS ASSOCIATED
26    WITH MR. COMPTON'S PHONE NUMBER.  THESE INSTAGRAM
27    ACCOUNTS ARE ASSOCIATED WITH A PHONE NUMBER AND
28    INSTAGRAM WILL SOMETIMES RECOMMEND CONTACTS THAT ARE IN
```

1   YOUR PHONE TO ACCOUNTS THAT YOU MIGHT BE INTERESTED IN

2   FOLLOWING.

3           SO I WAS ABLE TO LATER CONFIRM THAT IT WAS

4   MR. COMPTON.  AND I CALLED MY ATTORNEY AND LET HIM KNOW

5   WHAT WAS GOING ON AT THE TIME.  AND WE BOTH AGREED IT

6   WAS VERY ODD AND I JUST KEPT SOME RECORDS OF IT, MOST OF

7   WHICH I STILL HAD AND FORWARDED IT OVER TO THE COURT,

8   THE -- MORE THINGS DURING THAT SAME TIME.  SO THE SAME

9   DAY THAT DEMONTGUITAR WAS REGISTERED --

10      THE COURT:  MR. DEMONT?  MR. DEMONT, CAN I ASK YOU

11  SOMETHING?  IT LOOKS LIKE YOU'RE READING.  ARE YOU

12  READING SOMETHING?

13      THE WITNESS:  I HAVE MY STATEMENTS IN FRONT OF ME.

14      THE COURT:  OKAY.  TURN YOUR STATEMENT OFF.  I

15  DON'T WANT YOU READING FROM A STATEMENT, OKAY?  THANK

16  YOU.

17          I'M GOING TO INTERRUPT HERE BECAUSE I NEED

18  TO ASK THIS QUESTION.  YOU SAID THAT YOU DETERMINED IT

19  WAS MR. COMPTON, BUT YOU DIDN'T TELL ME HOW YOU

20  DETERMINED THAT.

21          HOW DID YOU DETERMINE IT WAS HIM?

22      THE WITNESS:  THERE'S TWO WAYS.  THE FIRST WAS

23  THAT I CALLED MR. SMITH WHO CALLED MR. COMPTON AND

24  MR. COMPTON TOLD MR. SMITH THAT HE WAS DOING THAT.  AND

25  SUBSEQUENTLY, MR. SMITH ASKED HIM TO STOP AND HE DID.

26  THE SECOND, WHICH I DIDN'T FIND OUT TILL LATER, WAS THAT

27  THE INSTAGRAM ACCOUNT, WHICH IS ATTACHED TO THE WEBSITE

28  WAS ALSO ATTACHED TO MR. COMPTON'S PERSONAL CELL PHONE

1   NUMBER.

2        THE COURT:  OKAY.  AND THEN YOU HAVE DOCUMENTS

3   SHOWING THAT?

4        THE WITNESS:  I CAN'T RECALL WHICH DOCUMENTS I

5   SUBMITTED.  I DIDN'T HAVE THE DOCUMENT SHOWING THAT THE

6   SAME DATE DEMONTGUITAR WAS REGISTERED THROUGH A FAKE

7   INTERNET IP ADDRESS USING A VPN, RYAN COMPTON WAS ALSO

8   REGISTERED USING THE SAME SERVER GODADDY ON THE SAME DAY

9   AND USING THE SAME PRIVATE REGISTRY FEATURES, WHICH ARE

10  [TECHNICAL DIFFICULTY] TO THE PUBLIC.

11            AND JUST AS OF FEBRUARY, HE REWRITES THE

12  THIRD MY DOMAIN -- I'M SORRY, THE DOMAIN,

13  DEMONTGUITAR.COM WITH GOOGLE.  AND, LIKEWISE, WITHIN A

14  COUPLE OF DAYS REGISTERED, RYAN COMPTON GOT [TECHNICAL

15  DIFFICULTY] SYMBOLS OVER TO GOOGLE.

16       THE COURT:  AND HOW DO YOU KNOW -- HOW DO YOU KNOW

17  IT'S HIM INSTEAD OF SOMEBODY PRETENDING TO BE HIM?

18       THE WITNESS:  WELL, YOU CAN ONLY ASSOCIATE YOUR

19  INSTAGRAM ACCOUNT WITH A PERSONAL VERIFIED CELL PHONE

20  NUMBER.  AND ONLY PEOPLE WHO ARE IN YOUR CONTACT LIST

21  AND YOU HAVE ALLOWED ACCESS TO INSTAGRAM AND WHO IS

22  ASSOCIATED WITH IT.

23            SO WHEN I LOG INTO INSTAGRAM ON A PHONE FROM

24  MY BUSINESS ACCOUNT, IT WILL SAY HERE'S SOME PEOPLE THAT

25  ARE IN YOUR CONTACTS, WOULD YOU LIKE TO FOLLOW AND THAT

26  WAS ONE OF THE ACCOUNTS.

27       THE COURT:  WHICH WAS ONE OF THE ACCOUNTS?

28       THE WITNESS:  DEMONTGUITAR.  THAT ACCOUNT WAS

```
 1    RECORDED ON INSTAGRAM AND SUBSEQUENTLY REMOVED FROM
 2    INSTAGRAM, BUT THAT WAS THE --
 3         THE COURT:  RIGHT.  I UNDERSTAND THAT.
 4              BUT WHAT I'M SAYING IS, HOW DO YOU KNOW
 5    SOMEBODY ELSE DIDN'T USE DEMONTGUITAR?  WHY ARE YOU
 6    SPECIFICALLY SAYING IT WAS MR. COMPTON?  OR WHAT DID YOU
 7    KNOW?  AND THE ONLY REASON WHY I'M ASKING THIS IS
 8    BECAUSE OBVIOUSLY I'M NEW TO THE SITUATION, SO I'M
 9    TRYING TO GET AN EXPLANATION FROM YOU ABOUT THIS THOUGHT
10    PROCESS.
11         THE WITNESS:  OF COURSE.  YOU CAN ONLY VERIFY AN
12    INSTAGRAM ACCOUNT WITH A PERSONAL CELL PHONE NUMBER.  I
13    GUESS IT DOESN'T HAVE TO BE PERSONAL.  BUT YOU VERIFY IT
14    WITH YOUR CELL PHONE NUMBER.  AND THEN IT REGISTERED TO
15    IT.  THE CELL PHONE NUMBER IS NOT VISIBLE TO THE PUBLIC.
16    BUT IF YOU BOTH ALLOW ACCESS TO INSTAGRAM TO YOUR
17    CONTACT LIST, IT WILL RECOMMEND PEOPLE ON YOUR LIST.
18              SO LET'S SAY YOU CREATED AN INSTAGRAM FOR
19    SOME REASON AND YOU CONFIRMED YOUR CELL PHONE NUMBER,
20    THAT SENDS YOU A CODE.  YOU TYPE YES AND THEN YOU TYPE
21    IN THE CODE.  AND THEN IT WILL SAY, HERE'S A LIST OF
22    SOME FRIENDS YOU MIGHT KNOW.  AND IT WILL COME UP WITH
23    ANYONE THAT'S ON YOUR PHONE BOOK CONTACT ADDRESS THAT
24    YOU'VE ALLOWED IT TO CONNECT TO.  I HOPE THAT MAKES SOME
25    SENSE.
26         THE COURT:  SURE.  BUT LET ME ASK YOU THIS.  DID
27    YOU EVER RECEIVE ANYTHING SAYING THAT THIS PARTICULAR
28    CONNECTION WAS BECAUSE OF A SPECIFIC NUMBER?
```

```
 1            THE WITNESS:  YES.
 2            THE COURT:  OKAY.  AND DID YOU PROVIDE THAT
 3    DOCUMENT TO COUNSEL?
 4            THE WITNESS:  NO.
 5            THE COURT:  OKAY.  ALL RIGHT.  COUNSEL, YOU CAN GO
 6    AHEAD.
 7            MR. LEE:  THANK YOU.
 8       Q      BY MR. LEE:  NOW, INITIALLY YOU VERIFIED
 9    THAT YOU [TECHNICAL DIFFICULTY] -- STATED BY SPEAKING TO
10    MR. SMITH; IS THAT CORRECT?
11       A      CORRECT.
12       Q      NOW, PRIOR TO REACHING OUT TO MR. SMITH
13    BASED ON YOUR STATEMENT TO THE COURT, WHAT TYPE OF
14    INVESTIGATION DID YOU ENGAGE IN TRYING TO FIGURE OUT
15    WHAT WAS GOING ON WITH THE ONLINE ACTIVITY?
16       A      I'M TRYING TO RECALL THIS FROM QUITE SOME
17    TIME AGO.  BUT I CALLED OUR IT GUY.  HE RAN A WHO IS
18    SEARCH -- IS A PUBLIC RECORDS OF WHO OWNS AND REGISTERED
19    THAT DOMAIN AND WHAT COMPANY THEY DID IT THROUGH.  IT
20    ALSO SHOWS THE IP ADDRESS THEY REGISTERED THROUGH.
21            MR. COMPTON IS SOMEWHAT OF A SELF-PROCLAIMED
22    HACKER.  I USE THAT TERM LIGHTLY.  AND SO I CHECK THE IP
23    ADDRESS THAT IT WAS REGISTERED TO IT WAS VPN SERVER.  A
24    VPN SERVER OUT OF CHICAGO, WHICH IS OF COURSE NEAR US.
25    A VPN SERVICE MAP IS YOUR TRUE IP ADDRESS.  YOU CAN'T
26    SEE WHERE IT'S ACTUALLY COMING FROM.
27            SO THE REGISTRAR SERVICE THAT REGISTERED IT
28    OFFERS A SERVICE THAT ALSO HIDES YOUR PERSONAL
```

```
 1    INFORMATION.  THAT WAS ALSO HIDDEN.  ON A COMPLETE

 2    CONTRACT CHECK, IF ANYONE OWNS RYANCOMPTON.COM AND IT

 3    WAS REGISTERED THE SAME DAY, USING THE VERY SAME SERVER,

 4    ALSO THROUGH A PRIVATE REGISTRATION FOR RYANCOMPTON.COM

 5    AND DEMONTGUITAR.COM.

 6              LIKE I SAID, IT JUST ADDS UP.  A FEW DAYS

 7    AGO WHEN I WAS DOING A LITTLE MORE RESEARCH TO SEE WHAT

 8    I HAD ON THE DOCUMENT, I NOTICED THAT MR. COMPTON MOVED

 9    HIS POSTING OVER TO GOOGLE AS EARLY AS -- OR AS LATE AS

10    FEBRUARY.  I DON'T RECALL THE EXACT DATE.  BUT HE MIGHT

11    [TECHNICAL DIFFICULTY] EMAIL AROUND.

12         Q    LET ME STOP YOU RIGHT THERE.  THANK YOU.

13              NOW, AT THIS POINT IN TIME WHERE YOU'RE

14    DOING THIS BACKGROUND SEARCH, YOU DON'T HAVE ANYTHING

15    DEFINITIVE TO LINK MR. COMPTON TO ANYTHING AT THIS POINT

16    IN TIME?

17         A    NO.

18         Q    OKAY.  BUT BECAUSE OF THE ACTIVITY THAT YOU

19    SEE, YOU THOUGHT TO REACH OUT TO MR. SMITH, IS THAT WHAT

20    OCCURRED?

21         A    CORRECT.

22         Q    AND THIS WAS BASED ON A HUNCH BETWEEN THE

23    WAY THE DEMONTGUITAR ACCOUNT AND REGARDING THAT ACCOUNT

24    CAME ABOUT AND THEN BECAUSE OF YOUR OWN PERSONAL

25    INVESTIGATION TO THE RYAN COMPTON ACCOUNT?

26         A    YES.  MR. COMPTON HAD BEEN UPSET, LIKE I

27    SAID, I THINK BECAUSE WE'RE A LITTLE BEHIND SCHEDULE.

28    AND ACTING A BIT ODD, A LITTLE BIT OFF.  AND THAT'S WHY
```

```
 1   I REACHED OUT TO MR. SMITH.
 2        Q      SO AT THIS POINT, YOU HAD JUST A STRONG
 3   SUSPICION, BUT THE SUSPICION HAS YOU REACH OUT TO
 4   MR. SMITH?
 5        A      YES.
 6        Q      NOW, DO YOU RECALL THAT CONVERSATION BETWEEN
 7   YOURSELF AND MR. SMITH, APPROXIMATELY HOW IT WENT?
 8        A      YES, I DO.  IT WAS PARTIALLY PHONE CALL AND
 9   PARTIALLY TEXT.  I BELIEVE I TEXTED HIM FIRST AND SAID
10   SOMETHING TO THE EFFECT OF, YOU KNOW, WHAT IS THIS?  DID
11   YOU DO THIS?  WHAT'S GOING ON?  I PROBABLY ACCUSED HIM
12   OF IT INDIRECTLY.  AND HE WAS A BIT OFFENDED.  I CALLED
13   HIM AND TALKED TO HIM.  AND I SAID, WELL, NONE OF THIS
14   MAKES SENSE.  AND EITHER HE OR I, I DON'T REMEMBER WHO
15   SUGGESTED CONTACTED RYAN.  HE DID THAT AND HE CALLED ME
16   BACK AND HE SAID, YES, IT WAS RYAN.  I'M SORRY.  I
17   TALKED TO HIM.  HE'S GOING TO STOP IT AND TAKE IT DOWN.
18   AT WHICH POINT, HE DID.  IT WAS CHANGED BY THE NEXT DAY
19   AS WE -- AND THEN FORWARDED IT TO OUR REAL WEBSITE FOR A
20   CERTAIN PERIOD OF TIME THAT I'M NOT SURE OF.
21        Q      SO DO YOU EVER HAVE ANY DIRECT COMMUNICATION
22   WITH MR. COMPTON?
23        A      YES.
24        Q      IN REGARDS TO THIS TRANSACTION SPECIFICALLY?
25        A      NO.
26        Q      BUT YOU SPOKE TO MR. SMITH.  AND AFTER HE
27   TOLD YOU THAT HE SPOKE TO MR. COMPTON WITHIN THE 24-HOUR
28   PERIOD, EVERYTHING WAS CORRECTED?
```

```
 1        A       CORRECT.
 2        Q       NOW, YOU MADE A COMMENT EARLIER ABOUT
 3   MR. COMPTON BEING A SELF-PROCLAIMED HACKER.  COULD YOU
 4   PLEASE EXPLAIN WHY YOU USE THAT PHRASING?
 5        A       YES.  I CAN'T RECALL EXACT INSTANCES.  BUT
 6   HE WAS ALWAYS VERY PROUD OF HIMSELF FOR USING A PCN TO
 7   MATCH HIS IP ADDRESS AND SECURE EMAILS.  AND, I MEAN,
 8   HIGH ENCRYPTION TECHNOLOGY -- IT WASN'T ANYTHING -- I
 9   MEAN, IT'S ALL INTERESTING, BUT HE WAS REALLY INTO THAT.
10        Q       AND THIS IS FROM INDIVIDUAL CONVERSATIONS
11   YOU HAD DIRECTLY WITH MR. COMPTON OR INTERACTIONS WITH
12   MR. COMPTON?
13        A       I REALLY CAN'T RECALL ANY EXACT
14   CONVERSATION.
15        Q       BUT YOU CAN RECALL PERSONALLY WITNESSING,
16   YOU KNOW, HIM BEING VERY PROUD OF THIS TYPE OF
17   TECHNOLOGY?
18        A       YES.
19        MR. LEE:  NO FURTHER QUESTIONS, YOUR HONOR.
20        THE COURT:  THANK YOU.
21             MR. COMPTON, DO YOU HAVE ANY QUESTIONS OF
22   THIS WITNESS?
23        THE RESPONDENT:  NO, NONE COME TO MIND.
24        THE COURT:  OKAY, THANK YOU VERY MUCH.
25             THANK YOU VERY MUCH, MR. DEMONT.
26             MR. LEE, IS THERE ANYTHING ELSE?
27        MR. LEE:  NO, YOUR HONOR.
28        THE COURT:  OKAY.  MR. COMPTON, DO YOU WANT TO
```

```
 1    STATE ANYTHING ELSE?
 2          THE RESPONDENT:  NO.
 3          THE COURT:  OKAY, VERY GOOD.
 4              MR. LEE, WOULD YOU LIKE TO MAKE A BRIEF
 5    STATEMENT BEFORE THE COURT MAKES ITS DECISION?
 6          MR. LEE:  WOULD WE LIKE TO DISCUSS THE EXHIBITS
 7    ENTERING?
 8          THE COURT:  YEAH, LET'S DO THAT BECAUSE -- THANK
 9    YOU FOR REMINDING ME.  THE -- GIVE ME ONE SECOND BECAUSE
10    I NEED TO PULL UP YOUR EXHIBIT LIST.
11              I WANT YOU TO NAME THE EXHIBIT, THE NUMBER
12    OF THE EXHIBIT, AND TELL ME WHAT IT IS.  AND WE'LL GO
13    THROUGH THAT IN THAT MANNER.
14          MR. LEE:  IT'S IDENTIFIED AS EXHIBIT 2 TO START
15    WITH, THIS IS THE PETER.VAN.ART POST.
16          THE COURT:  OKAY.  IS THERE -- MR. COMPTON, IS
17    THERE ANY OBJECTION?
18          THE RESPONDENT:  NO.
19          THE COURT:  OKAY.  MR. COMPTON, LET ME YOU ASK
20    THIS.  ARE THERE ANY OBJECTIONS TO ANY OF THE EXHIBITS
21    THAT THEY PROFFERED?
22          THE RESPONDENT:  NO.
23          THE COURT:  SO, COUNSEL, SINCE THERE'S GOING TO BE
24    NO OBJECTIONS, JUST -- I WANT YOU TO LIST EACH EXHIBIT
25    THAT YOU WANT TO ENTER AND WHAT THAT EXHIBIT IS AND HOW
26    MANY PAGES IT IS.
27          MR. LEE:  UNDERSTOOD, YOUR HONOR.
28              EXHIBIT 2, PICTURE OF PETER.VAN.ART POST
```

43

```
 1    WITH A BITCOIN, ONE PAGE.
 2              EXHIBIT 10, PICTURE OF MR. SMITH INBOX, ONE
 3    PAGE.
 4              EXHIBIT 11, PICTURE OF EMAIL FROM YOUTUBE TO
 5    MR. SMITH, ONE PAGE.
 6              EXHIBIT 12, EMAIL FROM YOUTUBE TO MR. SMITH
 7    WITH MR. COMPTON'S INFORMATION, ONE PAGE.
 8              EXHIBIT 13, PICTURE OF MR. SMITH'S LAPTOP
 9    SHOWING FAN ARCHIVE COLLECTION, ONE PAGE.
10              EXHIBIT 14, PICTURE OF MR. SMITH'S GMAIL
11    INBOX SHOWING DROPBOX INFORMATION CHANGE, ONE PAGE.
12              EXHIBIT 15, INVITE FROM SWAMPDUST FOR
13    MR. SMITH TO VIEW A FILE THROUGH DROPBOX, ONE PAGE.
14              AND, EXHIBIT 16, INVITE FROM SWAMPDUST FOR
15    MR. SMITH TO VIEW A FILE THROUGH DROPBOX, ONE PAGE.
16         THE COURT:  WHAT NUMBER WAS THAT?
17         MR. LEE:  16.
18         THE COURT:  THANK YOU.
19         MR. LEE:  EXHIBIT 17, ACCOUNT EMAIL ADDRESS
20    RECENTLY CHANGED THROUGH DROPBOX, ONE PAGE.
21              EXHIBIT 18, SWAMPDUST INVITING MR. SMITH TO
22    VIEW A FILE IN DROPBOX, ONE PAGE.
23              EXHIBIT 19, SWAMPDUST INVITING MR. SMITH TO
24    EDIT A FOLDER THROUGH DROPBOX, ONE PAGE.
25              EXHIBIT 21, PETER.VAN.ART INSTAGRAM, ONE
26    PAGE.
27              EXHIBIT 22, KYLE WOKER POST, ONE PAGE.
28              EXHIBIT 24, WOKEKYLE POST, ONE PAGE.
```

```
 1              EXHIBIT 25, PETER.VAN.ART COMMENT, ONE PAGE.
 2              EXHIBIT 28, KYLE WOKER COMMENT ON YOUTUBE,
 3    ONE PAGE.
 4              EXHIBIT 31, EMAIL FROM SWAMPDUST TO MONA
 5    VOGEL, ONE PAGE.
 6        THE COURT:  31; CORRECT?
 7        MR. LEE:  YES, 31.
 8              EXHIBIT 34, SCREENSHOT OF PETER.VAN.ART
 9    INSTAGRAM PAGE, ONE PAGE.
10              EXHIBIT 35, EMAIL FROM YOUTUBE REGARDING
11    COPYRIGHT, ONE PAGE.
12              EXHIBIT 36, KYLE WOKER -- ON GOLDFINCH
13    GUITARS, ONE PAGE.
14              EXHIBIT 38, PHOTOGRAPH REGARDING SELLING
15    GUITARS FOR HEROIN ONE PAGE.
16              EXHIBIT 39, PETER.VAN.ART COMMENTS ON
17    INSTAGRAM, ONE PAGE.
18              EXHIBIT 42, PETER.VAN.ART COMMENT, INSTAGRAM
19    COMMENT, ONE PAGE.
20              EXHIBIT 44, PETER.VAN.ART'S COMMENTS ON
21    INSTAGRAM, ONE PAGE.
22              EXHIBIT 45, PETER.VAN.ART COMMENT ON
23    INSTAGRAM, ONE PAGE.
24              EXHIBIT 47, OBSCENE MAIL CARD, MAIL TO
25    MR. SMITH, ONE PAGE.  I'M SORRY, TWO PAGES.  I'M SORRY,
26    THREE PAGES.
27              EXHIBIT 47, THREE PAGES.
28              EXHIBIT 48, PETER.VAN.ART INSTAGRAM
```

```
 1   COMMENTS, ONE PAGE.
 2               AND, YOUR HONOR, WAS THE COURT GOING TO
 3   ACCEPT THE SUPPLEMENTAL DECLARATION OF MR. SMITH INTO
 4   EVIDENCE AS WELL?
 5         THE COURT:  YES.
 6         MR. LEE:  AND NOTHING FURTHER.
 7         THE COURT:  OKAY, THANK YOU.
 8               SO THOSE EXHIBITS WILL BE ADMITTED INTO
 9   EVIDENCE BY REFERENCE ONLY.  MEANING THE PARTIES MUST
10   HOLD ON TO THE EXHIBITS UNTIL ALL APPELLATE PROCESSES
11   HAVE BEEN COMPLETED.
12
13             (EXHIBITS 2, 10, 11, 12, 13, 14, 15, 16,
14              17, 18, 19, 21, 22, 24, 25, 28, 31, 34, 35,
15              36, 38, 34, 35, 36, 38, 39, 42, 44, 45, 47,
16              AND 48 ARE MARKED AND ADMITTED INTO EVIDENCE.)
17
18         THE COURT:  MR. LEE, DID YOU WANT TO MAKE ANY
19   BRIEF COMMENTS BEFORE THE COURT RENDERS ITS OPINION?
20         MR. LEE:  WELL, YOUR HONOR, JUST VERY BRIEFLY.
21   RESPONDENT DID ADMIT TO OWNING A CERTAIN EMAIL ACCOUNT
22   THAT IS ASSOCIATED WITH VARIOUS TRANSACTIONS, WHICH
23   PATENTLY CAUSED MY CLIENT TO BE HARASSED AND SUFFER
24   SUBSTANTIAL EMOTIONAL HARM AND DURESS OF HIS INFORMATION
25   BEING PRESENTED TO THE PUBLIC.  FALSE INFORMATION TO BE
26   PRESENTED [TECHNICAL DIFFICULTY], LOSS OF BUSINESS FROM
27   A TRANSACTION THAT IS VERY SIMILAR IN SCOPE AND CONTEXT
28   OF WHAT HAPPENED TO DEMONT GUITARS.
```

```
 1              WE ALL KNOW THAT THERE IS NOT A DIRECT
 2    SMOKING GUN, SO TO SPEAK.  IT IS VERY TELLING THAT EACH
 3    ONE OF THESE INSTANCES WHERE MR. COMPTON WAS CONFRONTED
 4    AND DEMONT GUITARS CASE, ITEMS WERE CHANGED.  AND IN
 5    MR. SMITH'S CASE, THE INFORMATION IS JUST RELEVANT TO
 6    AND PART OF TRANSACTIONS SPECIFIC TO MR. COMPTON.  IN
 7    SUCH A QUESTION AND MANNER THAT WE BELIEVE HE'S
 8    DEMONSTRATED BY CLEAR AND CONVINCING EVIDENCE THAT HIS
 9    ACTIONS DO ORIGINATE WITH MR. COMPTON.
10              AND WITH THAT, I WILL REST, YOUR HONOR.
11         THE COURT:  THANK YOU.
12              MR. COMPTON, WOULD YOU LIKE TO SAY ANYTHING
13    BRIEFLY BEFORE I RENDER MY DECISION?
14         THE RESPONDENT:  NO.
15         THE COURT:  OKAY, THANK YOU VERY MUCH.
16              THE PETITIONER'S REQUEST OF A CIVIL
17    HARASSMENT RESTRAINING ORDER PURSUANT TO CCP 527.6, THE
18    STANDARD OF PROOF THAT IS PRESCRIBED UNDER CCP 527.6 (I)
19    IS A STANDARD OF CLEAR AND CONVINCING EVIDENCE PURSUANT
20    TO EVIDENCE CODE SECTION 115.
21              CLEAR IS DEFINED AS A LACK OF VAGUENESS OR
22    AMBIGUITY.  CONVINCING IS SUBSTANTIAL, SOMETHING THAT'S
23    CONSIDERABLE, A HIGHER PROBABILITY THAN -- EXCUSE ME, A
24    PREPONDERANCE.  AND THIS IS DIFFERENT THAN SOMEBODY
25    HAVING A FEELING OR A THOUGHT THAT -- OR A POSSIBILITY
26    OR SUSPICION OF SOMETHING.
27              AND I THINK THERE ARE FACTORS THAT HAVE TO
28    BE PROVEN UNDER 527.6 IN CONJUNCTION WITH THAT STANDARD
```

1   OF PROOF.  THERE HAS TO BE A COURSE OF CONDUCT WITH A

2   CONTINUITY OF PURPOSE.

3           THE COURT FINDS ON ITS FACE, THERE APPEARS

4   TO BE A COURSE OF CONDUCT WITH THE CONTINUITY OF

5   PURPOSE.  THE ACT IS KNOWING.  THE COURT, I THINK, HAS

6   ENOUGH EVIDENCE TO SAY THAT THIS ACT IS KNOWING.  THE

7   COURT BELIEVES THAT BECAUSE IT'S KNOWING, IT'S ALSO

8   WILLFUL.  THE FACTS SEEMS TO BE DIRECTED TO A SPECIFIC

9   PARTY TO A CERTAIN EXTENT.

10          AS I INDICATED BEFORE, I DO NOT THINK THAT

11  THERE'S A BASIS FOR A RESTRAINING ORDER UNDER THE CIVIL

12  HARASSMENT STATUTE AS THE OTHER PARTIES LISTED AND THAT

13  THEY WOULD HAVE TO APPLY FOR THEIR OWN.  SO THESE ARE

14  JUST THE ITEMS THAT WE'RE TALKING ABOUT IN RELATION TO

15  THE PETITIONER.

16          THE ACT IS INTENDED TO SERIOUSLY HARASS.

17  THE COURT CAN MAKE AN INFERENCE THAT ANY MANIPULATION OF

18  SOMEBODY'S PRIVATE DATA, ET CETERA, WAS INTENDED TO

19  SERIOUSLY HARASS.

20          THE COURT CAN ALSO INFER THAT THERE IS NO

21  LEGITIMATE PURPOSE FOR THESE ACTS IF IN FACT THE COURT

22  BELIEVES THESE ACTS TO BE TRUE.

23          THE COURT SEES ONGOING CONDUCT AND THE COURT

24  CAN MAKE AN INFERENCE THAT THIS -- THERE'S A LIKELIHOOD

25  OF REPETITION.  AND THE COURT CAN ALSO MAKE AN INFERENCE

26  THAT THERE IS POTENTIALLY UNLAWFUL HARASSMENT.

27          HOWEVER, THIS IS WHERE THE -- THIS BECOMES A

28  LITTLE BIT MORE PROBLEMATIC, WHICH IS, NUMBER ONE, A

1  REASONABLE PERSON TO SUFFER SUBSTANTIAL DISTRESS AND

2  CAUSE SUBSTANTIAL EMOTIONAL DISTRESS.

3          COUNSEL, YOU ARGUED THAT THERE WAS, BUT I

4  DIDN'T HEAR ANY EVIDENCE THAT THERE WAS AND HOW THAT

5  MANIFESTED ITSELF.  WHICH IS A PROBLEM BECAUSE THAT'S

6  ONE OF THE ELEMENTS.

7          MORE SO, GOING TO THE ISSUES OF WHO DID THIS

8  IS PROBLEMATIC.  THE ISSUE WHO DID THIS IS RELEVANT TO

9  THIS BECAUSE THE RESPONDENT IS ALLEGED TO HAVE DONE

10 THESE ACTS.  AND BY YOUR OWN ARGUMENT, THERE'S NO DIRECT

11 SMOKING GUN IN THIS CASE.  I AGREE WITH YOU.  AND THAT

12 IS NOT CLEAR AND CONVINCING EVIDENCE.

13         I THINK I WOULD HAVE BEEN MORE COMFORTABLE

14 POTENTIALLY REACHING A DIFFERENT CONCLUSION IF I HAD HAD

15 THE ISSUE OF THE EMOTIONAL DISTRESS SATISFIED TO THE

16 EXTENT THAT 527.6 REQUIRES IT.  BUT, ALSO, I WOULD HAVE

17 BEEN MORE SATISFIED IF I HAD THE FOLLOWING.  NUMBER ONE,

18 COMPLETE DOCUMENTS OF TRANSACTIONS THAT ARE ALLEGED TO

19 HAVE BEEN MADE.  I HAVE A LOT OF SCREENSHOTS.  I DON'T

20 KNOW WHY THE ORIGINALS WEREN'T PROVIDED IN THEIR FULL

21 CONTEXT.  THINGS ARE CUT OFF, THINGS DON'T HAVE DATES,

22 THINGS LIKE THAT.

23         NUMBER TWO, IS THAT I DON'T KNOW WHY I DON'T

24 HAVE SUBPOENAED DOCUMENTS.  THE SUBPOENAED DOCUMENTS

25 FROM THE ISP'S OR FROM THE EMAIL PROVIDERS, ET CETERA,

26 WOULD HAVE GIVEN ME A LITTLE BIT MORE CONFIDENCE ABOUT

27 WHAT I AM SEEING.

28         NUMBER THREE, THE COURT HAS SOME CONCERNS

1    ABOUT THE ISSUE RELATED TO THE RESTRAINING ORDER THAT

2    WAS REQUESTED OF ANOTHER PARTY AND NOT MR. COMPTON.

3              I FIND IT HARD TO BELIEVE THAT THIS

4    CONVERSATION -- BECAUSE I WAS LOOKING AT SPECIFICALLY

5    THE DECLARATION OF -- GIVE ME ONE SECOND HERE.

6              IS THE DECLARATION OF MR. DEMONT.  AND I

7    NOTICED THAT THIS DECLARATION BY MR. DEMONT STATES THAT

8    IT WAS MADE ON OCTOBER 20TH OF 2021.  THIS IS REALLY IN

9    TIME TO WHEN ALL THIS IS HAPPENING.  AND I'M SITTING

10   THERE AND SAYING TO MYSELF, WELL, WHY IS THERE A

11   RESTRAINING ORDER AGAINST ANOTHER PARTY IF, IN FACT,

12   THERE'S AN IDEA THAT MR. COMPTON IS THE PERSON BEHIND

13   THIS?

14             AND I HAD ASKED MR. SMITH ABOUT WHY HE

15   DIDN'T FILE AGAINST MR. COMPTON, ESPECIALLY IN THIS

16   SCENARIO, BECAUSE IT SOUNDS LIKE MR. COMPTON, YOU KNOW,

17   WAS THE MASTERMIND OF THE GROUP.  AND I USE THE GROUP

18   BASED ON THE DECLARATION TALKING ABOUT THIS GROUP.

19             WHY MR. COMPTON WASN'T FILED ON IN TERMS OF

20   A RESTRAINING ORDER BACK IN 2021.  BUT RATHER ANOTHER

21   PERSON WAS.  AND HE INDICATED THAT WHILE HE DIDN'T TRULY

22   BELIEVE IT UP UNTIL THE TIME OF RECENTLY IN FEBRUARY OF

23   2022.  WELL, THIS DECLARATION OF MR. DEMONT SEEMS LIKE

24   THAT -- THAT'S NOT TRUE.  IT DOESN'T SEEM LIKE THAT'S

25   WHEN THAT HAPPENED.  IT SEEMS LIKE MR. COMPTON

26   POTENTIALLY WAS SUSPECTED AT ALL TIMES.

27             SO -- AND GOING TO MR. DEMONT'S STATEMENTS,

28   YOU KNOW, I HAVE AN INDEPENDENT PARTY WHO HAD A

1    POTENTIAL BUSINESS DISPUTE WITH MR. COMPTON AND

2    POTENTIALLY WITH MR. SMITH.  AND HE'S THE ONE WHO IS

3    VERIFYING ALL THIS INFORMATION.  IF HE KNEW THAT

4    MR. COMPTON WAS DOING THIS, I DON'T KNOW WHY HE CALLED

5    MR. SMITH IN RELATION TO THIS.  AND MR. SMITH IS THE ONE

6    WHO IS CONFIRMING THIS.

7              THIS IS ALL VERY UNCLEAR.  THE REQUIREMENT

8    UNDER 527.6 IS THAT IT BE CLEAR.  IT'S VERY UNCLEAR.

9              SO FOR ALL OF THOSE REASONS, I DO NOT THINK

10   THAT THE PETITIONER HAS PROVEN HIS CASE.  ANY TEMPORARY

11   RESTRAINING ORDERS IN THIS MATTER IS NOW DISCHARGED AND

12   THIS CASE IS DISMISSED.

13             ANYTHING ELSE, MR. LEE?

14        MR. LEE:  NOTHING FURTHER, YOUR HONOR.

15        THE COURT:  OKAY.  MR. COMPTON, ANYTHING ELSE?

16        THE RESPONDENT:  NO.

17        THE COURT:  OKAY.  THANK YOU VERY MUCH.

18        MR. LEE:  THANK YOU.

19        THE COURT:  ALL EXHIBITS WERE ADMITTED BY

20   REFERENCE ONLY.

21

22                        -O0O-

23

24

25

26

27

28

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF LOS ANGELES

 3    DEPARTMENT ST22          HON. MICHAEL R. POWELL, JUDGE

 4

 5    PHILIP SMITH,                    )
                                       )
 6              PETITIONER,            )
                                       )
 7         VS.                         )   NO. 22STRO04032
                                       )
 8    RYAN COMPTON,                    )   REPORTER'S
                                       )   CERTIFICATE
 9              RESPONDENT.            )
      _____)

10

11

12

13              I, KIM J. YOKOYAMA, OFFICIAL REPORTER OF THE

14    SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE

15    COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT I DID

16    CORRECTLY REPORT THE PROCEEDINGS CONTAINED HEREIN AND

17    THAT THE FOREGOING PAGES 1 THROUGH 50, INCLUSIVE,

18    COMPRISE A FULL, TRUE, AND CORRECT TRANSCRIPT OF THE

19    PROCEEDINGS AND TESTIMONY TAKEN IN THE MATTER OF THE

20    ABOVE-ENTITLED CAUSE ON SEPTEMBER 20, 2022.

21

22              DATED THIS  17TH DAY OF NOVEMBER, 2022.

23

24

25

26

27              _____
                    KIM J. YOKOYAMA, CSR NO. 12617
28                        OFFICIAL REPORTER
```